**NATIONAL FAMILY INSURANCE COMPANY, Respondent,**

v.

**Lonnie BOYER, et al., Defendants,**

**and**

**Paul Voigt, intervenor, Appellant.**

**No. 47962.**

Supreme Court of Minnesota.

June 2, 1978.

Gray, Plant, Mooty, Mooty & Bennett and James S. Simonson and David R. Kelly, Minneapolis, for appellant.

Rufer, Hefte, Pemberton, Schulze, Sorlie & Sefkow and Morrison, Kershner, Fergus Falls, for respondent.

Heard before ROGOSHESKE, YETKA, and SCOTT, JJ., and considered and decided by the court en banc.

SCOTT, Justice.

This is an appeal from the judgment entered pursuant to an order of the Becker County District Court granting summary judgment in favor of respondent, National Family Insurance Company (National), which had sought a declaratory judgment delineating the coverage afforded by an automobile insurance policy it had issued to defendant Lonnie Boyer.

Boyer had shot intervenor-appellant, Paul Voigt. Voigt had obtained a judgment against Boyer for $800,000. Boyer's home-owner's insurance carrier, defendant Foremost Insurance Company, had defended him and eventually settled with Voigt. National had denied coverage. Voigt admits that this was a proper case for summary judgment since there was no issue of material fact, but claims that the court's ruling was erroneous. We affirm.

The issue in this case is whether there is coverage for the shooting under Boyer's automobile insurance policy.

On November 8, 1975, Voigt, then age 21, was in Detroit Lakes, Minnesota, where he had driven a busload of campers as part of his job as a school bus driver. He and his fellow driver, Steven Alger, had gone that evening to the Erie Junior, a restaurant, where, beginning about 8:30 p. m., they each had two drinks, dinner, and then two more drinks in the bar.

That same day Boyer and his friend Earl Senn had been deer hunting on a farm owned by Senn's brother, having spent the previous night drinking at a VFW club and driving around looking for the farm. They had an early dinner at the farm and then drove to the Erie Junior, having about three beers each on the way. Boyer also had three or four swallows out of a bottle of whiskey he had in the car. At the Erie Junior the two men each had about six more drinks. Senn got in an argument with a man at the bar, and one of the man's friends joined in; Boyer was momentarily out of the room. It appeared that a fight was imminent. Alger and Voigt, apparently for no reason, moved to stand behind Senn in a supportive way, and the tension dissipated.

When Boyer returned, he, Senn, Alger, and Voigt struck up a conversation. Alger and Voigt wanted to go somewhere with a livelier atmosphere; Boyer and Senn suggested another club, the Broken Wheel. Because Alger and Voigt had no transportation, having arrived at the Erie Junior in a car driven by another bus driver, who had then gone to a movie, Boyer and Senn offered them a ride. They left the Erie Junior together and arrived at the Broken Wheel about 10 p. m. En route to the Broken Wheel, Boyer, who was driving, showed Alger and Voigt a .44 Ruger revolv-

er which had been under the seat. Voigt remembered Boyer saying, "This gun isn't for you." Boyer and Senn each had another beer during the 6-mile trip.

The group stayed at the Broken Wheel for about a hour, during which Boyer had between two and seven more drinks. Shortly before 11 p. m. Alger and Voigt asked Boyer and Senn for a ride back to the Erie Junior, in order to make a connection with their ride back to the camp. Boyer, Senn, and Alger then left the bar and walked into the parking lot. Alger and Senn, noticing that Voigt was missing, went back to get him while Boyer went on to the car.

Boyer, intending that Senn drive, sat in the front passenger seat and picked up the pistol. He had the door open and, apparently for no reason, fired the pistol twice into the air, holding it in the space between the car and the open door. Then Boyer decided that because there was hunting gear in the back seat Voigt should ride in the middle of the front seat; "So," he testified, "I swung my feet out the car and put my right hand up in the air like to get out, put my hand forward and the gun was in that hand and at that time the gun went off." At this point, Voigt was close to the car. He testified that he was "in the process of opening" the right rear door so he could get into the back seat of the car. Either the first or the third shot hit Voigt in the arm, passing through his body, and came to rest against his spinal cord, causing permanent paralysis. Boyer stated in his deposition that he may have caught the hammer of the gun on the inside of the car's roof, but on further examination he testified as follows:

"Q  Mr. Boyer, the fact of the matter is you do not know what caused that gun to discharge the third time, do you?

"A  No, I don't.

"Q  And you are only speculating that the hammer may have caught on the molding?

"A  It's just a speculation."

1. Under the language of the policy, the trial court found as a matter of law that Voigt's injury was not one "arising out of the ownership, maintenance or use of the owned automobile  *  *  *  [including] the loading and unloading thereof  *  *  *."[1]

Whether or not Boyer and Voigt were making "use" of the car when Voigt was shot is a threshold question which should be answered before the issue of whether or not the shooting "arose out of use" of the car is determined. Moreover, cases on this point indicate that the "use" must be one which can be characterized as the use of a car *as a car*, at least in the sense that if the car is found to be the "mere situs" of the accident, coverage will not exist under the automobile policy. Several categories of "car use" cases have been cited by both parties as shedding light on this issue.

▬ First, there are numerous "missile" cases, where a bottle, firecracker, or some other object is thrown from a moving car, resulting in injury. These cases are not, on the whole, particularly helpful. Where coverage is denied, it is usually because the insured's "voluntary, deliberate act" in committing an intentional tort is considered to be an independent cause which renders the "car use" element incidental. *Speziale v. Kohnke*, 194 So.2d 485, 487 (La.App.1967). See, *McDonald v. Great American Ins. Co.*, 224 F.Supp. 369, 373 (D.R.I.1963). As noted in *Richland Knox Mut. Ins. Co. v. Kallen*, 376 F.2d 360, 365 (6 Cir. 1967), "[C]ertainly not every tortious act occurring inside a vehicle constitutes use of that vehicle; and  *  *  *  the lighting of a firecracker inside a car does not involve the use of a car, any more than lighting a firecracker during business hours is a business pursuit."

---

1. The key provisions of the policy are: "[National Family Insurance Company agrees]  *  *  [to] pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of  *  *  *  bodily injury  *  *  *  arising out of the ownership, maintenance or use of the owned automobile  *  *  *.

*   *   *   *   *   *

" '[U]se' of an automobile includes the loading and unloading thereof."

A second category, with greater application to the present facts, consists of cases in which the transportation or storage of dangerous items, including guns, is proposed as a "use" of an automobile. These cases tend to give rise to broad dicta favoring coverage, e. g., the statement by the court in *National Indemnity Co. v. Corbo*, 248 So.2d 238, 240 (Fla.App.1971), that " '[u]se' extends to any activity involved in the utilization of the covered vehicle in the manner intended or contemplated by the insured." There, the insured driver, who regularly transported a guard dog to a business establishment, left a passenger and the guard dog in the car while he went into a store. This was held to be a covered "use" when the dog bit the passenger. Nevertheless, it seems that in practice the insurer is not held liable for any bizarre "use" the insured can dream up; rather, the test actually applied appears to be foreseeability on the part of the *insurer*, so that, for example, in finding coverage in another dogbite case a California court pointed out that "[t]he transportation of household pets in family cars is commonplace." *Hartford Acc. & Indem. Co. v. Civil Service Employees Ins. Co.*, 33 Cal.App.3d 26, 32, 108 Cal.Rptr. 737, 741 (1973).

The court in *Reliance Ins. Co. v. Walker*, 33 N.C.App. 15, 234 S.E.2d 206, certiorari denied, 293 N.C. 159, 236 S.E.2d 704 (1977), used similar language in finding that an automobile insurance policy covered an injury which occurred when a man entering a truck was shot by a rifle which, hanging in a permanently mounted gun rack, discharged for no discernible reason. "Clearly," the court stated, "the transportation of guns was one of the uses to which the truck had been put." 33 N.C.App. 22, 234 S.E.2d 211. Another court, in *Travelers Ins. Co. v. Aetna Cas. & Sur. Co.*, 491 S.W.2d 363, 366 (Tenn.1973), reasoned the same way, that *use* means *use*: " * * * [W]hen young Muehlman was loading his shotgun into the vehicle, he was making 'use' of the vehicle * * *. The vehicle was being used to transport the young men and their weapons on a hunting trip." The United States Fifth Circuit Court of Appeals carried this line of thought to its logical conclusion in *Fidelity and Cas. Co. of New York v. Lott*, 273 F.2d 500, 502 (5 Cir. 1960), where the court found that use of a car to brace a gun was covered. The court responded to the argument that "the automobile was being 'used' as a gun-rest and not as a vehicle" by stating that "[t]he obvious answer to this is that no such limitations were placed on the word 'use' by the insurance company in the preparation of its policy." But, in *Norgaard v. Nodak Mutual Ins. Co.*, 201 N.W.2d 871 (N.D.1972), another gun-rest case, the court explicitly rejected the *Fidelity and Cas. Co. of New York v. Lott* analysis. Perhaps the difference between the two is in the facts: In *Lott*, it appears that the roof of the car deflected the bullet so that it hit a passenger, whereas in *Norgaard* the decedent walked into the line of fire, so that the physical structure of the car did not contribute to his injury.

Minnesota has followed North Dakota's "gun-rest" approach. See, *Engeldinger v. State Auto. & Cas. Underwriters*, 306 Minn. 202, 236 N.W.2d 596 (1975). In that case, an intoxicated person was carried to a parked car, where he froze to death during the night. The court stated that "[a]pplying that [gun-rest] theory to the facts before us, certainly the use of the automobile as an overnight resting place for the decedent is not the use of it as a vehicle." 306 Minn. 208, 236 N.W.2d 600. That this case may not represent total acceptance of the "inherent nature of the automobile" test is, however, suggested by the fact that the provision construed in *Engeldinger* was an exclusionary clause in a homeowner's policy. The opinion in *State Farm Mut. Auto. Ins. Co. v. Partridge*, 10 Cal.3d 94, 109 Cal. Rptr. 811, 514 P.2d 123 (1973), was quoted extensively in *Engeldinger* to demonstrate that the result did not have to be the same if an automobile policy's general coverage provisions were involved.

The third, and most directly applicable, group of "use" cases involves the effect of provisions which define use as including loading and unloading. It is held in most jurisdictions, including Minnesota, that a

"loading and unloading" clause extends the coverage provided for "use" of a vehicle. *State Auto. & Cas. Underwriters v. Casualty Underwriters,* 266 Minn. 536, 124 N.W.2d 185 (1963); *Gulf Ins. Co. v. Mack Warehouse Corp.,* 212 F.Supp. 39 (E.D.Pa.1962). In *Allstate Ins. Co. v. Truck Ins. Exch.,* 63 Wis.2d 148, 216 N.W.2d 205 (1974), the court found that "loading and unloading" was covered as an aspect of "use" even without a specific term to that effect.

Two tests are commonly used to determine whether a particular accident is an aspect of "loading and unloading"; the broad "complete operation" test, and the narrower "coming to rest" doctrine. Annotations, 160 A.L.R. 1259 and 95 A.L.R.2d 1122. Under the "complete operation" test, coverage for gunshot wounds has been extended to situations where a hunter is attempting to take the shells out of a gun at some distance from the car. For example, in *Allstate Ins. Co. v. Valdez,* 190 F.Supp. 893 (E.D.Mich.1961), the insured was ejecting shells 25 feet from his car when he slipped on some ice and fired the gun, killing a passenger. Coverage was based on the fact that he was preparing to load his car.

Decisions which do not explicitly refer to the "complete operation" test have also found coverage to exist for shootings. In *Viani v. Aetna Ins. Co.,* 95 Idaho 22, 501 P.2d 706 (1972), a man threw a friend's bedroll off a truck into the driveway, and was shot by a pistol which had been rolled up in the bedding; his injuries were held to have been incurred in "unloading," and to be covered by the truck insurance policy. And in *Laviana v. Shelby Mut. Ins. Co.,* 224 F.Supp. 563 (D.Vt.1963), a man who was standing next to a car with its door open while ejecting shells shot the driver when the door swung closed on him. The court explained:

> "The plaintiff was engaged in 'loading * * *'. The plaintiff was standing near the open door of the car in anticipation of entering. The door of the car was instrumental in producing the accident." 224 F.Supp. 565.

Minnesota has never explicitly adopted either the "complete operation" or the "coming to rest" approach to the "loading and unloading" issue. Recent cases on this point have been somewhat inconclusive. In *State Farm Mut. Ins. Co. v. O'Brien,* 380 F.Supp. 1279 (D.Minn.1974), a 6-year-old child started a truck while his mother was removing cans of water from its bed, so that she was pinned against the house. The United States District Court found that while she was "unloading," the boy's act in starting the truck was not a "use" of the truck covered by the policy. The court observed that "Ronald cannot be said to have been in any way engaged in a loading or unloading process." 380 F.Supp. 1282. In other words, this is a case where there was not sufficient causal nexus between the unloading and the injury to afford coverage. The case of *Warner Hardware Co. v. Allstate Ins. Co.,* 309 Minn. 529, 245 N.W.2d 223 (1976), appears at first glance to be more directly on point. There, a snowblower being delivered in a store employee's car fell on the buyer's fingers. The "loading and unloading" clause was held not to afford coverage; rather, the store's business insurance covered the injury. The court was operating, however, in the context of a jury verdict to the effect that the store's negligence, i. e. the selection of an employee's car as the means of delivery, was the sole cause of the accident. It was this decision by the management, rather than negligence imputed to the store from the employee's handling of the snowblower, which was the basis of liability.

Assuming that Voigt and Boyer were "using" the car when the accident happened, there is still a question as to whether or not this "use" was sufficiently causally related to the shooting to afford coverage. Many cases are cited by both parties as clarifying the phrase "arising out of use," which governs this issue of causation.

Respondent rightly insists that the language "arising out of use" requires a more specific finding of causation than would be needed to satisfy the policy term "while using"; use of the car must be related to

the accident in some way beyond being its "mere situs." See, *Brenner v. Aetna Ins. Co.,* 8 Ariz.App. 272, 445 P.2d 474 (1968); *Azar v. Employers Casualty Co.,* 178 Colo. 58, 495 P.2d 554 (1972); *Mason v. Celina Mut. Ins. Co.,* 161 Colo. 442, 423 P.2d 24 (1967); *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Bruecks,* 179 Neb. 642, 139 N.W.2d 821 (1966); *State Farm Mut. Auto. Ins. Co. v. Centennial Ins. Co.,* 14 Wash.App. 541, 543 P.2d 645 (1975); *Lyndoe v. American Standard Ins. Co. of Wis.,* 245 N.W.2d 273 (S.D.1976).

Minnesota has never definitely adopted any one formula for the degree of causation the phrase "arising out of" requires, but rather has chosen to be guided by the phrasings of several other jurisdictions in carrying out its own case-by-case analyses:

"In general terms, it has been established that such relationship need not be a proximate cause in the strict legal sense. Rather, it is sufficient to establish that the injury or loss 'was a natural and reasonable incident or consequence of the use of the [insured] vehicle.' It has been said that the causal connection must be 'reasonably apparent,' and that 'the mere fact that the use of the vehicle preceded the harm which was later sustained is not sufficient to bring such harm within the coverage of the policy.' It has also been held that the policy term 'arising out of' means 'originating from,' or 'having its origin in,' 'growing out of,' or 'flowing from.' In any event, each case presenting such a question must, to a great degree, turn on the particular facts presented." *Associated Ind. Dealers v. Mutual Serv. Ins.,* 304 Minn. 179, 181, 229 N.W.2d 516, 518 (1975).

The ultimate decision under this set of facts must necessarily narrow to whether or not the injury was a natural and reasonable consequence of the use of the vehicle. This incident, to say the least, was an irrational, bizarre happening. The record discloses that it had nothing to do with hunting. The shooting happened in the parking lot of a nightclub after Boyer had had many drinks and had gone without much sleep for some 30 hours. The theory that the hammer of the gun caught on the inside of the roof is pure speculation. In fact, it is not even known which of the three shots hit Voigt.

■ We see no relationship between the use of this gun at that time and the use of the automobile for transportation purposes and find that the automobile was the mere situs of the injury. There is thus no coverage under this policy of insurance based upon this factual setting.

Because of our holding we need not consider the issue of whether the automobile policy and the homeowner's policy are mutually exclusive.

Affirmed.