(894 P.2d 226)
No. 71,055

TAD GARRISON, *Appellant*, v. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, *Defendant/Counterclaimant-Appellee*, and DAIRYLAND INSURANCE COMPANY, *Intervenor/Counterclaimant-Appellee*, and KURT PFANNENSTIEL, *Counterclaimant-Defendant*.

Opinion filed April 21, 1995.

*Larry D. Tittel*, of Ness City, for appellant.

*Stephen M. Kerwick*, of Foulston & Siefkin, of Wichita, for appellee State Farm Mutual Automobile Insurance Company.

*Arthur S. Chalmers*, of Kahrs, Nelson, Fanning, Hite & Kellogg, of Wichita, for appellee Dairyland Insurance Company.

Before LARSON, P.J., ROYSE, J., and JEAN F. SHEPHERD, District Judge, assigned.

LARSON, J.: Tad Garrison appeals the trial court's ruling in favor of State Farm Mutual Automobile Insurance Company (State Farm) and Dairyland Insurance Company (Dairyland), holding insurance coverage did not exist for his gunshot wound.

Garrison was seriously injured when a shotgun discharged as Kurt Pfannenstiel removed the gun from Garrison's car during a hunting trip. Garrison sued Pfannenstiel for negligence and Garrison's automobile insurer, State Farm, for personal injury protection (PIP) benefits.

State Farm defended on the basis that the accident did not arise out of the ownership, use, or maintenance of a motor vehicle

and counterclaimed for a declaration that the liability portion of Garrison's policy did not afford coverage to Pfannenstiel for Garrison's negligence claim against him. Dairyland, Pfannenstiel's automobile insurance carrier, intervened to seek a ruling that no liability coverage existed under the policy it had issued.

The case was submitted on an agreed record consisting of the depositions of Garrison and Pfannenstiel plus copies of the respective insurance policies. After reviewing briefs and hearing arguments, the trial court ruled the accident did not arise out of the use of a vehicle and entered judgment in favor of both insurance carriers.

This unfortunate accident occurred in September 1992, when Garrison and Pfannenstiel went dove hunting in rural Ness County. Garrison drove his State Farm insured car during the entire hunting excursion.

The two men stopped on several occasions to shoot birds. Each time they entered and left the car they stowed their guns between the front seats along the console with the barrels pointing toward the floorboard.

After several stops they saw some birds and decided that Pfannenstiel would get out of the car and Garrison would then drive on to the far end of a line of trees and hunt there. Garrison slowed the car; as it approached or came to a stop and Pfannenstiel was getting out of the car, Pfannenstiel's shotgun discharged, striking Garrison in the leg and causing a significant injury. Neither party knew what caused the shotgun to fire. Pfannenstiel did not remember if the shotgun came in contact with any part of the car as it fired, although part of Garrison's injury was caused by the knob of a radio which the blast forced through his leg. Neither Garrison nor Pfannenstiel knows if the safety had been engaged before Pfannenstiel picked up the gun.

There are essentially three portions of the insurance policies which are in issue. As to Garrison's PIP claim, State Farm contested coverage under the following provision:

"SECTION II—NO FAULT—COVERAGE P
"What We Pay

"We will pay in accordance with the *No-Fault Act* for *bodily injury* to an *insured*, caused by accident resulting from the ownership, maintenance or use of a *motor vehicle.*"

As to State Farm's counterclaim that liability coverage did not apply to Garrison's tort claim against Pfannenstiel, the following provisions are involved:

"SECTION I—LIABILITY—COVERAGE A

"We will:

"1. pay damages which an *insured* becomes legally liable to pay because of . . . *bodily injury* to others, and damage to or destruction of property . . . caused by accident resulting from the ownership, maintenance or use of *your car*; and

"2. defend any suit against an *insured* for such damages . . . .

. . . .

"Who Is an Insured

"When we refer to *your* car . . . *insured* means:

. . . .

"4. any other *person* while using such a *car* if its use is within the scope of the express or implied consent of *you* or *your* spouse."

The pertinent language of the Dairyland policy provides:

"*We* promise to pay damages for bodily injury or property damage for which the law holds *you* responsible because of a *car accident* involving a car *we* insure.'

"['Car accident' is defined as] 'an unexpected and unintended *event* that causes injury or property damage and arises out of the ownership, maintenance, or use of a *car* or other *motor vehicle.*' "

Garrison raises three issues: First, that he is entitled to PIP coverage; second, that liability coverage exists under both policies; and third, that the accident arose out of the ownership, maintenance, or use of a motor vehicle. He admits the first two questions are answered by the third, and we view the issue for our determination to be as follows:

*Does the accidental discharge of a shotgun, the cause of which is unknown, occurring while a gun is being unloaded from a car during a hunting trip, arise out of or result from the ownership, use, and maintenance of an automobile so that the resulting injuries are covered by an automobile insurance policy?*

The trial court's decision construing the insurance policies was based on an agreed record without controversy except that the

cause of the gun's discharge remains unknown. The testimony did not vary on any significant fact except whether the car had reached a complete stop when Pfannenstiel got out, but that was not a material fact in the trial court's decision.

Garrison assumes we review only a question of law and owe no deference to the trial court's decision. We reject State Farm's suggestion that the trial court made a factual finding that no coverage was available and that we are therefore limited to determining if substantial competent evidence supports that finding.

Where the facts are not controverted, we hold that "the construction and effect of a contract of insurance is a matter of law to be determined by the court." *Harris v. Richards*, 254 Kan. 549, Syl. ¶ 1, 867 P.2d 325 (1994). "As a general rule, the interpretation or construction and meaning and legal effect of written instruments are matters of law exclusively for the court and not questions of fact." *Federal Land Bank of Wichita v. Krug*, 253 Kan. 307, 311, 856 P.2d 111 (1993). The issue we consider does not hinge on any factual determination but rather on the interpretation of what the policy requires for an accident to arise out of the ownership, maintenance, or use of a motor vehicle. This is a legal question upon which our review is unlimited. See *Kennedy & Mitchell, Inc. v. Anadarko Prod. Co.*, 243 Kan. 130, 133, 754 P.2d 803 (1988).

Our review is not merely of the insurance policy; must also consider the statute under which the insurance policy was issued. The Kansas Automobile Injury Reparations Act (KAIRA), K.S.A. 40-3101 *et seq.*, requires the owner of every motor vehicle registered in Kansas to have liability insurance including "personal injury protection benefits to the named insured . . . for loss sustained . . . as a result of injury" including "bodily harm . . . resulting from an accident arising out of the ownership, maintenance or use of a motor vehicle." K.S.A. 1994 Supp. 40-3104(a), K.S.A. 40-3107 (f), and K.S.A. 1994 Supp. 40-3103(i).

The KAIRA is to be construed liberally to achieve the legislature's purpose "to provide a means of compensating persons promptly for accidental bodily injury arising out of the ownership, operation, maintenance or use of motor vehicles in lieu of liability

damages to the extent provided herein." K.S.A. 40-3102; *Whitaker v. State Farm Mut. Auto Ins. Co.*, 13 Kan. App. 2d 279, 281, 768 P.2d 320 (1989); *DiBassie v. American Standard Ins. Co. of Wisconsin*, 8 Kan. App. 2d 515, 520, 661 P.2d 812 (1983).

*Farm Bureau Mut. Ins. Co. v. Evans*, 7 Kan. App. 2d 60, Syl. ¶ 2, 637 P.2d 491 (1981), succinctly stated what is required for an accident to arise out of the use of a vehicle:

"In determining coverage for bodily injury claimed to have arisen out of the ownership, maintenance or use of an insured vehicle, a court must consider whether the injury sustained was a natural and reasonable incident or consequence of the use of the vehicle involved for the purposes shown by the declarations of the policy although not foreseen or expected."

In a Missouri gun discharge case, with similar issues to ours, the words "arising out of" and "use" were stated to be very broad, general, and comprehensive terms with "arising out of" ordinarily understood to mean "originating from," "having its origin in," "growing out of" or "flowing from." *Cameron Mut. Ins. Co. v. Ward*, 599 S.W.2d 13, 15 (Mo. App. 1980). Although a criminal case, *State v. Howard*, 221 Kan. 51, 53, 557 P.2d 1280 (1976), defined "use" as a common verb: "[O]rdinarily it means to employ; to avail oneself; to utilize; to carry out a purpose or action by means of; to put into action or service, especially to attain an end (citing Webster's New Collegiate Dictionary, 1975)." *Evans* further held that "[t]he general rule in other jurisdiction is that, 'arising out of the use' of a vehicle requires the finding of some causal connection or relation between the use of the vehicle and the injury." 7 Kan. App. 2d at 62.

It is generally held that the use of a vehicle need not be the proximate cause of the injury, but rather it is sufficient if the use of the vehicle is a cause in a more liberal sense. 7 Kan. App. 2d at 63. The *Ward* case stated that "although it is not required that the 'use' of the automobile be the 'direct and proximate' cause of the injury in the strict legal sense of causation permeating general tort law, there must be some causal connection between an injury and the 'use' of an automobile in order for there to be coverage." 599 S.W.2d at 15.

None of the Kansas cases considering if there is a sufficient causal connection or relationship between the use a vehicle and

the injury for insurance coverage to exist are sufficiently close factually to resolve the issues raised by this appeal.

In *Evans*, our court found that an injury caused by a firecracker, which was thrown from the rear of a station wagon parked in a large open field during a party and which landed in a beer glass and exploded, was not an accident that arose from the use of a car. 7 Kan. App. 2d at 63.

*Allied Mut. Ins. Co. v. Patrick*, 16 Kan. App. 2d 26, 819 P.2d 1233 (1991), involved a sexual molestation in an automobile. The opinion suggests that an incident is not an accident just because it takes place in an automobile. In denying coverage, we held the automobile must in some manner be involved in the accident and the mere fact that an accident takes place in or near the automobile does not necessarily impose responsibility upon the insurer.

There was no coverage in a tragic "bump and rob" case when an injured passenger and the estate of a deceased driver sought PIP benefits and uninsured motorist coverage under an automobile policy. See *Hamidian v. State Farm Fire & Cas. Co.*, 251 Kan. 254, 833 P.2d 1007 (1992). There, the Supreme Court held the death and injuries did not arise out of the ownership, operation, maintenance, or use of a motor vehicle. The court held the shootings, which occurred after the vehicle was bumped and while the parties were outside the car checking for damage, were intentional acts unrelated to the operation of the motor vehicle.

The Kansas case factually closest to ours is *Whitaker v. State Farm Mut. Auto Ins. Co.*, 13 Kan. App. 2d 279, where PIP benefits were held to exist for an injury sustained while the injured person was unloading an ice chest from a parked insured van.

After coverage was found to exist by the trial court in *Whitaker*, State Farm's appeal focused not on the use of the vehicle, but rather on a claimed distinction between policies insuring against "accidental results" and those insuring against "accidental means." Judge, now Justice, Davis' opinion held the attempted distinction is not recognized in Kansas but stated positively that we must construe the KAIRA liberally to accomplish the legislature's declared purpose of compensating injured insureds. It is clear that

the result reached would not be possible if Kansas required some physical intervention by the vehicle before the accident would be deemed to arise out of its use.

More instructive for our consideration are the numerous cases from other states which have considered factual situations involving the discharge of a firearm from within, while operating, while unloading, or while outside a motor vehicle. We will consider the numerous cases which are collected in an annotation entitled: Automobile Liability Insurance: What are accidents or injuries "arising out of ownership, maintenance, or use" of insured vehicle? 15 A.L.R.4th 10, §§ 8, 9, 10, and 11.

A majority of the cases appear to have reasoned that the transportation of guns for hunting is an ordinary and customary use of an automobile. One aspect of the use of a vehicle for hauling firearms is the loading and unloading of the guns at the hunting site. The North Carolina Supreme Court said:

"Since the transportation and unloading of firearms are ordinary and customary uses of a motor vehicle, and the injury-causing accident here resulted from the unloading of the transported rifle, such injuries were a natural and reasonable incident or consequence of the use of the motor vehicle." *State Capital Ins. Co. v. Nationwide Mut. Ins. Co.*, 318 N.C. 534, 540, 350 S.E. 2d 66 (1986).

The Colorado Supreme Court explained:

"In the present case, the evidence is clear that the claimants' injuries were causally related to the use of Weaver's jeep. The accident occurred while Weaver was lifting the rifle out of the jeep's gun rack preparatory to unloading the rifle and safely storing it for the journey home. Weaver's actions were intimately related to his use of the vehicle as transportation for himself and his rifle from a mountain hunting area to his home in Canon City." *Kohl v. Union Ins. Co.*, 731 P.2d 134, 137 (Colo. 1986).

The Supreme Judicial Court of Maine explained that whether or not the policy expressly covers the loading or unloading of a vehicle, such activity is part of the use of a vehicle:

"The vehicle in the instant case was being used to transport the two men and their firearms for the purpose of hunting. The utilization of the vehicle for a hunting trip constitutes a proper 'use' of the vehicle within the meaning of the Commercial Union policy. Incidental to that use, it was necessary, reasonable and foreseeable that the weapons would be placed into and removed from the vehicle at some point during the course of the expedition. The 'loading or un-

loading' of a firearm into or from a vehicle is a reasonable and proper use of the vehicle in this context [even where the policy does not define 'use' to include loading and unloading]. Because the injury occurred during the 'unloading' of the gun from the vehicle, the requisite causal connection is present." *Union Mut. Fire Ins. v. Commercial Union Ins.*, 521 A.2d 308, 311 (Me. 1987).

See also *Allstate Insurance. Co. v. Truck Ins. Exchange*, 63 Wis. 2d 148, 216 N.W.2d 205 (1974) (injury arising from unloading gun from vehicle while hunting constituted use of a vehicle even where loading and unloading was not specifically defined as use in the policy).

In *State Farm Mut. Auto. Ins. Co. v. Rice*, 239 Va. 646, 391 S.E.2d 71 (1990), coverage was found for the accidental discharge of a rifle as it was being picked up from an automobile seat based on principles established in the earlier Virginia case of *State Farm Mutual v. Powell*, 227 Va. 492, 500-01, 318 S.E.2d 393 (1984), where the court stated:

"[C]onsideration must be given to the intention of the parties to the insurance agreement in determining the scope of the coverage afforded. In addition, the 'ownership, maintenance, or use' provision should be construed in the light of the subject matter with which the parties are dealing; the terms of the policy should be given their natural and ordinary meaning. Even though ownership, maintenance, or use of the vehicle need not be the direct, proximate cause of the injury in the strict legal sense, nevertheless, there must be a causal relationship between the accident and employment of the insured motor vehicle as a vehicle. Furthermore, consideration must be given to what the insured person was doing when he was injured, as well as his purpose and intent, in determining whether that person was in such position in relation to the vehicle to be injured in its 'use.'"

Other courts following the same reasoning as these cases include *Payne v. Southern Guaranty Ins. Co.*, 159 Ga. App. 67, 68, 282 S.E.2d 711 (1981); *Viani v. Aetna Insurance Co.*, 95 Idaho 22, 30-31, 501 P.2d 706 (1972), *overruled on other grounds Sloviaczek v. Estate of Puckett*, 98 Idaho 371, 565 P.2d 564 (1977); *Travelers Insurance Co. v. Aetna Casualty & Sur. Co.*, 491 S.W.2d 363 (Tenn. 1973).

Missouri has adopted a line of reasoning in which it classifies automobile liability coverage/gun discharge cases into five factual categories. Although we question if this is consistent with our decision in *Evans*, the result we reach is supported by *Cameron*

*Mut. Ins. Co. v. Ward,* 599 S.W.2d 13, 15-16 (Mo. App. 1980), which stated:

"A second category of cases may be fittingly described as involving the accidental discharge of guns during the process of loading them into or unloading them from vehicles. The following typify cases which fall into this category: *Laviana v. Shelby Mutual Insurance Company,* 224 F. Supp. 563 (D.Vt. 1963); *Allstate Insurance Company v. Valdez,* 190 F. Supp. 893 (E.D.Mich. 1961); *Viani v. Aetna Insurance Company,* 95 Idaho 22, 501 P.2d 706 (1972); *Travelers Insurance Co. v. Aetna Casualty & Sur. Co.,* 491 S.W.2d 363 (Tenn. 1973); and *Allstate Insurance Co. v. Truck Insurance Exchange,* 63 Wis. 2d 148, 216 N.W.2d 205 (1974). Without exception, these cases hold that coverage exists under the insuring agreements of the respective automobile liability policies involved by reason of coverage extended to the process of loading and unloading vehicles."

State Farm argues that the lack of evidence showing that the automobile physically caused the gun to discharge makes the trial court's decision proper. Such a requirement is more akin to a proximate cause standard than the more liberal causation standard applied in this context. First, those cases allowing coverage for gun accidents arising while unloading a car during a hunting expedition do not require that the car physically cause the discharge. See *Kohl,* 731 P.2d at 135 (no physical connection between gun discharge and vehicle shown); *Payne,* 159 Ga. App. at 68 (no showing any active or passive condition of the vehicle contributed to the gun discharge); *Union Mut. Fire Ins.,* 521 A.2d at 309 (gun discharged when grasped, no link to movement or condition of vehicle); *State Capital Ins. Co.,* 318 N.C. at 536 (evidence showed only gun discharged when touched); *Travelers Ins. Co.,* 491 S.W.2d at 364 (reason for discharge unknown); *Rice,* 239 Va. 647-48 (gun discharged when picked up).

Second, those cases that look to a physical link to the vehicle do so in the context where there is no other link to the use of the car. For example, where a gun is discharged inside the car while it is moving, it is the physical link between the car and the gun which provides the requisite minimal causation. See *Southeastern Fidelity Ins. Co. v. Stevens,* 142 Ga. App. 562, 564, 236 S.E.2d 550 (1977). In our case, the minimal causal link need not be provided by the physical interaction of the car and the gun since it is provided by the foreseeable use of the vehicle for hunt-

ing. Third, even when a physical link is required circumstantial evidence of the involvement of the motion of the car is enough, and it is not necessary to prove why the gun fired. 142 Ga. App. at 564; see *State Farm Mut. Ins. Co. v. Partridge*, 10 Cal. 3d 94, 99, 109 Cal. Rptr. 811, 514 P.2d 123 (1973).

Despite its artful argument, most of the cases State Farm cited are consistent with allowing coverage in this case. The injuries in those cases did not arise from the foreseeable unloading or loading of firearms into a vehicle used to transport them for hunting purposes. Rather, several of the cases arise from the misuse or mishandling of a gun while in a vehicle—unrelated to any attempt to unload or load the vehicle and unrelated to any movement of the vehicle itself. *Brenner v. Aetna Insurance Co.*, 8 Ariz. App. 272, 273-74, 445 P.2d 474 (1968) (playing with gun while riding in vehicle during hunting trip); *Hartford Fire Ins. v. State Farm Mut. Auto. Ins.*, 264 Ark. 743, 744, 574 S.W.2d 265 (1978) (death caused by passenger playing with gun in parked vehicle); *Azar v. Employers Casualty*, 178 Colo. 58, 59, 495 P.2d 554 (1972) (preparing to shoot shotgun out of car window); *State Farm Fire & Cas. Co. v. Stroup*, 481 N.W.2d 853 , 854 (Minn. App. 1992) (dog caused gun on floor of moving vehicle to discharge); *National Union Fire Ins. Co. v. Bruecks*, 179 Neb. 642, 644, 139 N.W.2d 821 (1966) (carelessly attempting to unload gun in moving car after hunting); *Jordan v. Lee*, 76 Or. App. 472, 474, 709 P.2d 752 (1985) (child playing with gun inside vehicle); *State Farm Ins. v. Centennial Ins.*, 14 Wash. App. 541, 543 P.2d 645 (1975) (passenger unloading weapon in moving car not reasonable consequence of using vehicle on hunting trip). *Cf. Krause v. Citizens Ins. Co.*, 156 Mich. App. 438, 402 N.W.2d 37 (1986) (gun on top of vehicle not in the process of being unloaded from vehicle discharged; no coverage).

Other cases cited by State Farm deal with incidents of intentional shootings that had some passing relationship with a vehicle. See *Fortune Ins. Co. v. Exilus*, 608 So. 2d 139 (Fla. Dist. App. 1992); *Morgan v. Prudential*, 242 N.J. Super. 638, 577 A.2d 1300 (1990); *Jones v. State Farm Mut. Auto. Ins. Co.*, 589 So. 2d 333 (Fla. Dist. App. 1991). The two Kansas cases we have previously

cited, *Hamidian v. State Farm*, 251 Kan. 254, and *Allied Mut. Ins. Co. v. Patrick*, 16 Kan. App. 2d 26, may both be classified as intentional acts cases and are not determinative in the resolution of this appeal.

The cases which State Farm cites that provide the most persuasive support for its position are a series of Minnesota cases, *State Farm Fire & Cas. Co. v. Strope*, 481 N.W.2d 853 (Minn. App. 1992); *Hanson v. Grinnell Mut. Reinsurance Co.*, 422 N.W.2d 288 (Minn. App. 1988); and *Farmers Ins. Group v. Chapman*, 416 N.W.2d 857 (Minn. App. 1987), which require the vehicle to be an "active accessory" to the accident. There is nothing in our Kansas precedent that indicates our Supreme Court would impose this "active accessory" requirement.

Additionally, the Minnesota cases can be distinguished factually. In *Strobe*, the gun discharge was caused by a dog, not by unloading or interaction with the vehicle. In *Hanson*, the vehicle was immobile and used only to store rather than transport the guns. The factual scenario in *Chapman* was an accidental misfire when the gun was outside the vehicle after being unloaded.

Most importantly, it is not entirely certain that Minnesota would deny coverage in the context before us even under its active accessory rule. In *Hanson*, the Minnesota Court of Appeals noted "[t]he Minnesota Supreme Court has suggested that a covered 'use' might exist where a vehicle is being used to transport or store guns during a hunting trip. *See National Family Insurance Co. v. Boyer*, 269 N.W. 2d 10, 13 (Minn. 1978)." *Hanson*, 422 N.W.2d at 290.

The only authority cited by Dairyland beyond that raised by State Farm is a quote from 12 Couch on Insurance 2d § 45.56 (rev. ed. 1981), which states: "There is a great deal of litigation arising out of the transportation of firearms in insured motor vehicles where the gun discharges injuring passengers or third parties. The better position is that such accidents are not covered under an automobile liability policy." We remain unconvinced by this statement of policy and find it unsupported by the cited cases

which were primarily gunshot cases dealing with stopped vehicles that were not being loaded or unloaded.

The agreed record is unclear as to whether Garrison's vehicle had completely stopped, but we hold that it is not required in Kansas for the vehicle to physically contribute to the discharge of a gun. The requirement of a causal connection is satisfied by the use of the automobile for transporting the gun while hunting. Similarly, language noting that there is no coverage where the injury is caused by "an intervening cause not identifiable with normal . . . use of the insured vehicle," *Evans*, 7 Kan. App. 2d at 63, has no application here since the discharge of the gun, whatever the cause, was identifiable with the normal use of the vehicle for hunting. As we have previously noted, the existence of coverage in *Whitaker* would also be totally inconsistent with a requirement in Kansas of some physical intervention by the vehicle before an accident would be deemed to arise out of its use.

In summary, we hold the injury sustained by Garrison was a natural and reasonable incident or consequence of the use of vehicle involved, although not foreseen or expected. The use of the Garrison car for hunting was a reasonable and foreseeable use of the vehicle. It provides the necessary causal link between the accident and vehicle use so that the accident is held to result from that use. It was not necessary to prove an additional causal link by demonstrating the vehicle physically contributed to the shotgun's discharge.

State Farm argues that even if the accident did result from the use of the car, coverage should be excluded because Garrison did not give Pfannenstiel permission to have his loaded gun in the car with the safety off. This argument applies only to the liability coverage issues and does not relate to PIP coverage.

State Farm cites no persuasive authority for this contention. Additionally, the testimony clearly showed that Pfannenstiel was in the car as the result of Garrison's invitation. Neither party was certain as to whether the safety on the gun was on or off. The only thing State Farm showed was an after-the-fact statement by

Garrison that he would have requested Pfannenstiel to put the safety on had he known it was off.

Further, Garrison stated he did not know what precautions Pfannenstiel took before entering the car but he assumed the gun was loaded and made no specific safety request.

It would be contrary to the uncontroverted evidence to grant State Farm judgment on the ground Pfannenstiel was not "using such car . . . with the express or implied consent of you or your spouse." The evidence clearly shows Garrison gave Pfannenstiel permission to be in the car and participate in the hunt without regard to the status of the safety on the shotgun.

One further issue warrants our consideration. Attorney fees are improper in this case because the issues raised in good faith are of first impression in Kansas. See K.S.A. 40-256; K.S.A. 40-3111(b); *Whitaker v. State Farm Mut. Auto. Ins. Co.*, 13 Kan. App. 2d 279, 284-85, 768 P.2d 320 (1989).

Reversed and remanded to the trial court with instructions to enter judgment finding the accident arose out of the ownership, maintenance, and use of a motor vehicle along with the required findings of insurance coverage arising from such a judgment.