ZINTER, Justice
(dissenting).
[¶ 30.] Was this shooting an “auto accident”? I agree that the “use” of a pickup *537 for hunting is foreseeable, and that the transportation of firearms may be incident to use of a vehicle if the vehicle is actually being used on a hunting expedition. Under the undisputed and stipulated facts, however, this case involved the accidental discharge of a firearm that was merely being repositioned in a pickup that was still parked in the insured’s driveway before the pickup even left for the hunting expedition. Therefore, under all analogous cases, the shooting was not an “auto accident.”
[¶ 31.] The facts (even those established at trial) are undisputed, but some have not been mentioned by the Court. The day before this occurrence, the Peter-sons went to a “bale blind” they had established for deer hunting on land Brad Peterson owned in a neighboring county. This method of hunting did not involve the use of the vehicle other than a means of transportation to get to the blind. Once they arrived at the location on Friday, various members of the Peterson family hunted by standing in the blind waiting for deer to pass. On Saturday, the morning of this occurrence, some of the Petersons hunted again at the blind. They quit hunting that morning about 10:30 a.m.[5] and returned to Brad Peterson’s home, where they ate, cleaned up, change clothes, and possibly took a nap. Around 2:00 or 3:00 p.m. that afternoon they decided to hunt again.
[¶ 32.] At the time of the occurrence that afternoon, the rifle had been in the pickup for more than a day. Four of the Petersons were sitting in the parked pickup in the driveway of Brad’s home. They were waiting for Trent Peterson so they could go to Mitch Peterson’s home in order to get some dry clothes (Mitch was sitting in the pickup without shoes or socks at the time the gun discharged). After going to Mitch’s home, they intended to return to the bail blind to hunt. Before leaving, however, the gun accidentally discharged. At the time of the discharge, they were not loading or unloading the vehicle, the pickup was not moving, and the rifle was not jostled or moved as any occupant entered the vehicle. As they sat in the pickup waiting for Trent, Jeb Peterson noticed that the barrel of the rifle was pointed “in an unsafe position.” As he attempted to reposition the gun, it discharged. Jeb testified that the only reason he attempted to reposition the gun was because of its position: it was pointing towards Mitch’s legs. Under these circumstances, where the vehicle was not actually on the hunting expedition and was the mere situs of the occurrence, virtually all cases hold that the causal connection between the vehicle’s “use” and the injury-producing event is insufficient for this occurrence to be considered an “auto accident.”
[¶ 33.] Today’s Court engages in causation analysis under the “use” clause,[6] but *538 “stretchjes] far to find the requisite causal connection.” Brenner v. Aetna Ins. Co., 8 Ariz.App. 272, 276, 445 P.2d 474, 478 (1968). As Brenner noted:
From the standpoint of causation, this injury could have occurred in the woods, in a hunting lodge, or in a house. That the situs of the accident was in fact within a motor vehicle and the fact that both the tort-feasor and the injured party were ‘using’ the car at the time does not make the injury one ‘arising out of the ... use’ of the vehicle. Nor did the injury result from any incident of ‘ownership’ of the vehicle.
Id. Simply stated, a reasonable and ordinary person would not consider this occurrence to have been caused by the use of an automobile, and certainly would not consider this an “auto accident.”
[¶ 34.] Although the facts in the cases are varied driving different results, the rule of law governing the accidental discharge of firearms in motor vehicles is remarkably consistent. Virtually all courts apply a causal connection requirement in interpreting automobile insurance “use” clauses: a requirement that the shooting arise out of the ownership, maintenance or use of the automobile. In defining that causal connection requirement, most courts recognize that the use of a vehicle for hunting is foreseeable, and that the transportation of firearms may be incident to use of a vehicle if the vehicle is being used on a hunting expedition. Therefore, the cases require that at the time of the injury there must be a connection to the - “inherent use of the vehicle” and that the act must be “incident to the use of the vehicle.” See supra ¶ 21. A sufficient causal connection exists only when there is “foreseeable and reasonable use of the vehicle for hunting.” See supra ¶ 22 (citing Garrison v. State Farm Mut. Auto. Ins. Co., 258 Kan. 547, 907 P.2d 891, 895 (1995) (emphasis added)).[7]
[¶ 35.] In this case, that causal connection was not established. The undisputed *539 facts, as previously mentioned, reflect that at the time of the occurrence the vehicle was still parked in the driveway of Brad’s home. Moreover, the stipulation of the parties and the record reflect that Peterson family members had been engaged in at least two separate hunts, and were only intending to engage in a third. The parties’ stipulation states:
Various members of the Peterson family had been hunting the previous day on November 23, 2001. Some of those same members of the Peterson family also hunted in the morning of November 24, 2001, prior to the shooting incident involving Mitchell Peterson.
Stipulation of Facts ¶ 21 (emphasis added). The record explains that during the first hunt on Friday, November 23, 2001, Brad took his sons Shane and Jeb. Later, hunting in the afternoon, they met Leland Menske. Leland drove separately, and “he was in the bales stand with us.” Brad, Shane, and Jeb then drove home that night together.
[¶ 36.] Early Saturday morning, Brad left with Shane to pick up Mitch at a separate residence. On this second hunt, Brad, Shane, and Mitch hunted together. Jeb went hunting with Leland in Leland’s vehicle, and the parties later joined together. They quit hunting around 10 or 10:30 in the morning and returned to Brad’s home. Thus, notwithstanding the Court’s contrary appellate findings, these parties stipulated that at the time the rifle discharged, the morning hunt had concluded, the Petersons had retired to their home, the pickup was parked in the driveway of their home and was not moving. Although the Petersons intended to hunt at the bale blind again that afternoon, they had not left to begin hunting. Under these facts, every similar case has concluded that the accident was not causally connected to the use of the vehicle. The courts have uniformly held that such vehicles were the mere situs where an accidental discharge of a firearm occurred.
[¶ 37.] The Missouri Court of Appeals has catalogued the cases involving the discharge of firearms in motor vehicles. See Cameron Mut. Ins. Co. v. Ward, 599 S.W.2d 13 (Mo.Ct.App.1980). The facts of today’s case fall within the first category of cases involving “the accidental discharge of guns inside moving or motionless vehicles while an occupant of the vehicle is handling or toying with the gun.” Cameron, 599 S.W.2d at 15. As Cameron observed, “[w]ithout exception, these cases hold that no coverage exists under the insuring agreements of the respective automobile liability policies involved because there was no causal connection between the discharge of the guns and the use of the vehicles-” Id. Rather, “at best, the vehicles were merely the ‘situs’ or ‘locus’ of any resultant injuries as discharge of the guns was unconnected with the inherent use of the vehicles.” Id.
[¶ 38.] Those cases, involving both hunting and non-hunting handling of firearms inside a vehicle, find no causal relationship under the facts we consider today. See Western Cas. & Sur. Co. v. Branon, 463 F.Supp. 1208, 1211 (E.D.Ill.1979) (holding accidental discharge of firearm in moving motor vehicle did not implicate a sufficient causal connection to fall within the automobile use clause: “[A] fortuitous accidental shooting does not, merely because it takes place in a car, arise out of the use of the automobile.”); Am. Liberty Ins. Co. v. Soules, 288 Ala. 163, 168, 258 So.2d 872, 876 (1972) (holding that injuries sustained when pistol discharged as occupant pushed pistol down the back of the seat, at time automobile was parked, was not causally connected with use of the automobile: “[Ojccupant of an automobile injured by discharge of a firearm by an *540 other occupant [does not] constitute an injury arising out of the use of the insured automobile, for the reason that there is no causal relation between the use of the automobile and the injury.”); Hartford Fire Ins. Co. v. State Farm Mut. Auto., 264 Ark. 743, 574 S.W.2d 265 (1978) (holding accidental discharge of firearm inside vehicle does not fall within the use clause); Azar v. Employers Cas. Co., 178 Colo. 58, 61, 495 P.2d 554, 555 (1972) (holding that even while engaged in a hunting enterprise, accidental discharge of firearm inside stopped vehicle does not fall within the causal connection requirement of the use clause: “[I]t cannot reasonably be said that the discharge of the weapon in this case originated from, grew out of or flowed from the use of the vehicle. Rather, the injury originated from, grew out of or flowed from the use of the firearm.”); Mason v. Celina Mut. Ins. Co., 161 Colo. 442, 423 P.2d 24 (1967) (holding that even when returning from pistol target practice, an accidental discharge in vehicle that was parked until one of the occupants returned did not implicate the causal connection required to fall within the use clause) (citing 7 Appleman, InsuRanCe Law and Practioe § 4317, at 144, 146, for the proposition that the accident must have arisen “out of the inherent nature of the automobile ... in order to bring one within the terms of such a policy.”); U.S. Fid. & Guar. Co. v. W. Fire Ins. Co., 450 S.W.2d 491 (Ky.1970) (holding accidental discharge of gun when occupant began to load the gun was not sufficiently connected to the automobile to be considered to have been a use within the contemplation of the parties to the automobile insurance contract); Nat’l Family Ins. Co. v. Boyer, 269 N.W.2d 10, 15 (Minn.1978) (holding no relationship between the use of gun and the use of the parked automobile; the automobile was the mere situs of the injury); Nat’l Union Fire Ins. Co. of Pittsburgh, Pa. v. Bruecks, 179 Neb. 642, 139 N.W.2d 821 (1966) (holding that even broadly construing the use clause, a gun discharge while a hunter was unloading it inside of his vehicle was not covered because the vehicle was merely the situs of the accident; the accident did not arise out of the use of the vehicle); Raines v. St. Paul Fire & Marine Ins. Co., 9 N.C.App. 27, 175 S.E.2d 299 (1970) (holding no coverage under the use clause for accidental discharge of firearm in parked vehicle because there was no causal connection between the discharge of the pistol and the “ownership, maintenance or use” of the parked automobile); and State Farm Mut. Auto. Ins. Co. v. Centennial Ins. Co., 14 Wash.App. 541, 543 P.2d 645 (1975) (holding no coverage under use clause in which occupant unloaded a rifle in the vehicle causing the accidental discharge while returning from a hunting excursion).
[¶ 39.] The Court declines to discuss or distinguish these authorities. Instead, the Court labels and adopts the circuit court’s conclusions of law as “logical conclusion[s],” that this shooting “happened on a hunting expedition,” that the “movement [of the gun was] part of the use of the vehicle in the hunting expedition,” and therefore the pickup “was being used in a hunting expedition.” Supra ¶ 25 (emphasis added). These are appellate findings, and even if they were conclusions of law, they are entitled to no deference. Marschke v. Wratislaw, 2007 SD 125, ¶ 8, 743 N.W.2d 402, 405 (additional citations omitted). No deference is especially appropriate here because none of the historical facts established at trial are in dispute. Under those circumstances, our task is a mixed question of fact and law: i.e., whether the historical facts of this incident constitute an “auto accident,” a question we review de novo. See In re Dorsey & Whit *541 ney Trust Co., LLC, 2001 SD 35, ¶ 6, 623 N.W.2d 468, 471.
[¶40.] More importantly, this Court’s appellate findings are untethered to the use of the vehicle at the time of the shooting, and are in conflict with the parties’ stipulation of facts and the record upon which this case was presented. For example, the Court indicates “the afternoon hunt was a continuation of the morning hunting expedition,” suggesting that the Petersons “[t]emporarily stopp[ed] the vehicle for a brief snack break[.]” Supra ¶ 25. Similarly, the Court finds coverage because this vehicle was actually “being used to transport deer hunters to the field[J.” Supra ¶ 26.
[¶ 41.] Contrary to this Court’s findings, the stipulation specifically reflects that rather than being on the hunting expedition at the time of the occurrence, the shooting happened at a time when: “various members of the Peterson family were preparing to return to their hunting activities,” Stipulation of Facts, No. 22, the pickup “was not moving, was not in gear, but the engine was running,” id. No.19, and the four occupants were all seated in the pickup in the driveway of their home “waiting for Trent so they could leave to go hunting.” Id. No.19 (emphasis added). Considering these stipulated and undisputed facts, the Court mistakenly premises its holding on findings that at the time of the shooting “the vehicle was being used to transport deer hunters to the field,” and the pickup “was being used in a hunting expedition where guns are being transported,[■]” See supra ¶26 (emphasis added).
[¶ 42.] Most importantly, even if the Court were correct that Petersons intended to engage in a “continuation” of the morning hunt, the Court fails to consider two intervening events. First, there is no dispute that Petersons ceased hunting to rest and eat lunch, and that they had not left their home to return to the bale blind when the gun discharged. Second, there is no dispute that at the time of the discharge, they were going to go to Mitch Peterson’s home to get dry clothing before they were going to return to the bale blind to hunt. These types of intervening events must be considered in the causation analysis in such cases. See Norgaard v. Nodak Mut. Ins. Co., 201 N.W.2d 871, 875 (N.D.1972) (concluding that even while on a hunting expedition, use of a vehicle as a “gun rest” to shoot a firearm did not provide a sufficient causal connection between the vehicle in the accident under the use clause). The North Dakota Supreme Court noted, “the causal relationship need not constitute a proximate cause, but on the other hand if an injury is directly caused by some independent or intervening cause it does not arise out of the use of an automobile, notwithstanding there may have been some remote connection between the use of an automobile and the injury complained of.” Id.
[¶ 43.] The Court also fails to apply our own precedent recognizing the difference between being “on a hunting expedition” and “future hunting.” Lyndoe v. Am. Standard Ins. Co. of Wisconsin, 90 S.D. 644, 650, 245 N.W.2d 273, 276 (1976). Thus, “the proper inquiry in hunting accidents involving automobiles [requires an examination of] the use made of the vehicle at the time of the accident!.]” Sanchez v. Herrera, 109 N.M. 155, 157, 783 P.2d 465, 467 (emphasis added). When that timing examination is made, the Court’s own authorities do not support a causally related use of the vehicle in this case.
[¶ 44.] For example, although the Court relies on Garrison, that ease involved the following disparate facts:
After several stops [the occupants of the vehicle] saw some birds and decided that *542 Pfannenstiel would get out of the car and Garrison would then drive on to the far end of a line of trees and hunt there. Garrison slowed the car; as it approached or came to a stop and Pfan-nenstiel was getting out of the car, Pfan-nenstiel’s shotgun discharged, striking Garrison in the leg and causing a significant injury.
258 Kan. at 549, 907 P.2d at 893. The Kansas Supreme Court thereafter highlighted that different factual scenario in which a causally related use occurs because the vehicle is actually involved in the hunt:
The injury occurred while the car was being used to transport dove hunters during a hunting trip. Garrison was driving. The engine was running. Garrison stopped the car while Pfannenstiel tried to exit with his shotgun to hunt doves. The shotgun discharged while Pfannenstiel was removing it from the car. Garrison had intended to drive further after Pfannenstiel was out of the car. The car was “involved,” in that the injury occurred while Pfannenstiel was removing his shotgun from the car and Garrison was driving the car.
Id. at 554, 907 P.2d at 896. Thus, unlike today’s case, where the Petersons were still sitting in their driveway only intending to engage in hunting at a distant location, the parties in Garrison were actually “transporting] guns during a hunting trip.” Id. at 555, 907 P.2d at 896.
[¶ 45.] Similarly, the Court’s other primary authority, Allstate Ins. Co. v. Truck Ins. Exchange, 63 Wis.2d 148, 216 N.W.2d 205 (1974), concerns two individuals who were actually pursuing an elk in a vehicle specially adapted for hunting purposes. When the elk was located, the driver stopped the vehicle so the passenger could remove his loaded rifle from the vehicle to shoot the elk. In attempting to remove the rifle, it discharged, causing injury. In construing an exclusion under a general liability policy and a use clause providing coverage in an auto policy, the Wisconsin court found coverage under the auto policy because persons “actively engaged in loading and unloading the. automobile in the commonly accepted meaning of those words are considered to be using or operating the automobile and are covered by the loading and unloading provision of the policy.” Id. at 155, 216 N.W.2d at 209 (emphasis added). Peterson’s occurrence is not, however, a “loading and unloading” ease, nor does it involve participants “actively engaged” in the act of hunting.
[¶ 46.] Clearly, the Court’s decision is unsupported and contrary to any authority with remotely similar facts. In light of the stipulated fact that the various members of the Peterson family were only “preparing to return to their hunting activities,” and in light of the undisputed fact that they were still seated motionless in a parked vehicle in the driveway, how can the Court find coverage on contrary findings? Under the stipulated facts, the only connection between this shooting and the pickup was that the parties intended to use the pickup as transportation to go to the bale blind to hunt that afternoon. At the time of the occurrence, however, the Petersons had not started the afternoon hunting enterprise, and their intended use that afternoon cannot reasonably be construed as an “auto accident.”
[¶ 47.] Even giving the language of the policy insuring “auto accidents” the broad interpretation as required by Lyndoe, supra, the Court has stretched that language beyond common sense and reasonable understanding. We should not construe statutes (SDCL 32-35-70) and insurance contracts in such a manner. “We will not resort to a forced construction of the language in [an insurance] contract for the *543 purpose of either limiting or extending coverage.” Gloe v. Union Ins. Co., 2005 SD 30, ¶ 29, 694 N.W.2d 252, 260. “Insurance contracts warrant reasonable interpretation, in the context of the risks insured, without stretching terminology.” Zochert v. Nat’l Farmers Union Prop. & Cas. Co., 1998 SD 34, ¶ 5, 576 N.W.2d 531, 532 (citing Opperman v. Heritage Mut. Ins. Co., 1997 SD 85, ¶ 4, 566 N.W.2d 487, 490) (citing State Farm Mut. Auto. Ins. Co. v. Vostad, 520 N.W.2d 273, 275 (S.D.1994))).
[¶ 48.] Today’s case is similar to an accidental stabbing that occurred in the backseat of a vehicle in Washington. As the Washington Court of Appeals observed, “the average person would not consider the stabbing incident in [the insured’s] parked van as an ‘automobile accident.’ Rather, we believe the average person would ... say only that [the injured party] was stabbed while sitting in his automobile.” Grelis, 43 Wash.App. at 478, 718 P.2d at 813. Similarly, considering the actual use of Brad’s parked pickup at the time of this occurrence, the average person would not conclude that this shooting was an “auto accident.” The average person would say that Mitch was shot while sitting in the backseat of a parked pickup. Because, under the stipulated and undisputed facts, this shooting did not occur incident to the vehicle’s actual use in hunting, I dissent.
[¶ 49.] KONENKAMP, Justice, joins this dissent.

. Before they returned home that morning, they also "drove a tree belt” that was located about one mile from the bale blind. No other type of hunting activity was described at trial.

. I decline to join the Court's incorporation of use clause language into the "auto accident” provision of this policy through the policy's definition of an "insured.” See supra ¶ 12. As a Washington Court of Appeals noted:
[The injured party] argues ... that the policy definition of "injured person" gives a broader meaning to the term "automobile accident” and, thus, brings him, by implication, within the personal injury protection of the policy. An "injured person” is defined in the policy as "an insured person who is injured by accident while occupying or being struck by an automobile.” This language, however, does not broaden the scope of coverage defined in the policy ... which provides:
We will provide the benefits described below for injury to each insured person caused by an automobile accident.
*538 Farmers Ins. Co. of Washington v. Grelis, 43 Wash.Ct.App. 475, 478-79, 718 P.2d 812, 813 (1986). Similarly, the definition of an "insured” under the Milbank policy does not purport to broaden the scope of coverage for "auto accidents.”
Nevertheless, I agree with the Court’s alternative reason for incorporation of the use clause in this case. Use clause language ("ownership, maintenance or use”) is incorporated in all South Dakota auto policies under SDCL 32-35-70 (requiring insurance "against loss from the liability imposed by law for damages arising out of the ownership, maintenance, or use of the vehicle[.]”) See also State Farm Mut. Auto. Ins. Co. v. Centennial Ins. Co., 14 Wash.Ct.App. 541, 542-43, 543 P.2d 645, 646 (1975) (concluding that statute requiring coverage for "all sums which the insured shall become legally obligated to pay as damages because of bodily injury sustained by any person 'arising out of the ownership, maintenance or use, ... ’ including the loading and unloading of any insured vehicle” ... effectively mandates that motor vehicle liability policies contain the quoted phrase).

. The Minnesota Supreme Court adopted a consistent, but more comprehensive causal connection test:
In general terms, it has been established that such relationship need not be a proximate cause in the strict legal sense. Rather, it is sufficient to establish that the injury or loss ‘was a natural and reasonable incident or consequence of the use of the (insured) vehicle.' It has been said that the causal connection must be ‘reasonably apparent,’ and that ‘the mere fact that the use of the vehicle preceded the harm which was later sustained is not sufficient to bring such harm within the coverage of the policy.’ It has also been held that the policy term ‘arising out of' means ‘originating from,' or 'having its origin in,’ 'growing out of,’ or ‘flowing from.'
National Family Ins. Co. v. Boyer, 269 N.W.2d 10, 15 (Minn.1978) (citing Assoc. Ind. Dealers v. Mut. Serv. Ins., 304 Minn. 179, 181, 229 N.W.2d 516, 518 (1975)).