No. 103,499

ANGELA CADY, *Appellant*, v. JOHN SCHROLL, M.D., *Defendant*, WOMEN'S CARE, P.A., *Appellee*, CRISTINE CARRIKER, M.D., MAUREEN KING, M.D., MICHAEL MAGEE, M.D., JULIE MARTIN, M.D., BRENDAN MITCHELL, M.D., ANGELA PIQUARD, M.D., and ROBERT SUGAR, M.D., *Defendants*.

(317 P.3d 90)

Opinion filed January 24, 2014.

*Roger P. Wright*, of Wright, Green & Baughman, L.L.C., of Lee's Summit, Missouri, argued the cause, and *Lance V. Baughman* and *Theodore M. Green*, of the same firm, were with him on the briefs for appellant.

*BK Christopher*, of Horn Aylward & Bandy, LLC, of Kansas City, Missouri, argued the cause, and *Jessica J. Shaw* and *John B. McEntee, Jr.*, of the same firm, were with her on the briefs for appellee.

The opinion of the court was delivered by

LUCKERT, J.: K.S.A. 40-3403(h) provides that a health care provider qualified for coverage under the Health Care Stabilization Fund created by the Health Care Provider Insurance Availability Act (HCPIAA), K.S.A. 40-3401 *et seq.*, "shall have no vicarious liability or responsibility for any injury . . . arising out of the rendering of or the failure to render professional services . . . by any other health care provider who is also qualified for coverage under the fund." Past decisions of this court have interpreted this provision broadly, concluding it bars a covered health care provider's vicarious liability and any other responsibility, including independent or direct liability, for claims caused by the professional services of another health care provider. Angela Cady argues these cases were wrongly decided, are distinguishable, or have been effectively overruled. Consequently, Cady contends the district court and Court of Appeals in *Cady v. Schroll*, No. 103,499, 2011 WL 2535004 (Kan. App. 2011) (unpublished opinion), erred in relying on those cases and holding that her action against Women's Care, P.A., the health care provider that employed her physician, was barred by K.S.A. 40-3403(h). We disagree and affirm the district court and the Court of Appeals.

## FACTS AND PROCEDURAL BACKGROUND

Cady filed suit against her obstetrician, John Schroll, M.D., and Schroll's employer, Women's Care, P.A., after Schroll provided Cady's prenatal care during her pregnancy in 2004. Cady alleges that Schroll touched her inappropriately and made sexually charged comments during her office visits. Unbeknown to Cady, Schroll had previously been disciplined by the Kansas State Board

of Healing Arts (Board) for his inappropriate and unprofessional behavior with two other patients.

In Cady's petition, she named Schroll, Women's Care, and seven other physicians as defendants. Schroll and the other physicians were employed by and shareholders of Women's Care, a professional corporation. She asserted four claims against the defendants: medical negligence, negligent infliction of emotional distress, negligent supervision, and intentional infliction of emotional distress. In her petition, Cady alleged Women's Care was (1) vicariously liable for the acts and omissions of Schroll and (2) independently liable because it failed to supervise Schroll, failed to prevent him from engaging in inappropriate conduct with her, failed to inform her of Schroll's prior disciplinary record, and failed to institute safeguards to prevent Schroll's conduct.

Cady made several factual allegations to support these claims. Specifically, she alleged that before she became Schroll's patient, Women's Care knew about Schroll's prior inappropriate conduct and knew he had been disciplined by the Board. Cady further alleged that Women's Care had documented this knowledge in a "letter of concern" sent to Schroll in which Women's Care indicated that Schroll's inappropriate conduct had continued despite Women's Care's concerns having been discussed with Schroll, suggested Schroll be evaluated by a psychologist, and requested that a nurse be present during all of Schroll's patient examinations. Despite these concerns and requests, Cady asserted that Schroll was the only Women's Care employee present when the inappropriate conduct occurred.

As legal proceedings progressed, Cady entered into a separate settlement agreement with Schroll, and the district court dismissed the case against him with prejudice. The district court also dismissed with prejudice all of Cady's claims against the other physicians named in the lawsuit. Cady does not appeal any claims involving Schroll or the other physicians. Consequently, this appeal focuses solely on the liability, or lack thereof, of Women's Care.

Women's Care's potential for liability was ruled upon by the district court after Women's Care filed a motion to dismiss and, subsequently, a motion for summary judgment. The district court, treat-

ing both motions as ones for summary judgment, held that Cady's claims against Women's Care were barred by K.S.A. 40-3403(h). The Court of Appeals affirmed the district court. *Cady*, 2011 WL 2535004, at *5. This court granted Cady's petition for review under K.S.A. 20-3018(b) and has jurisdiction under K.S.A. 60-2101(b).

## STANDARD OF REVIEW

If a district court considers uncontroverted facts not contained in the pleadings when ruling on a motion to dismiss, the motion is treated as a motion for summary judgment. "Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Law v. Law Company Building Assocs.*, 295 Kan. 551, 561, 289 P.3d 1066 (2012). An appellate court reviewing a district court's ruling on a motion for summary judgment applies the same legal standard and, because the motion is considered on uncontroverted facts and under the same standard as the district court, reviews the matter de novo as a question of law, granting no deference to the district court's judgment. *Law*, 295 Kan. at 561; *Adams v. Board of Sedgwick County Comm'rs*, 289 Kan. 577, 584, 214 P.3d 1173 (2009).

In this case, resolution of the motions for summary judgment depends on an interpretation of K.S.A. 40-3403(h). Interpretation of a statute is also a question of law. As under the summary judgment standard, an appellate court exercises unlimited review and does not grant deference to the district court's interpretation of a statute. See *Stewart Title of the Midwest v. Reece & Nichols Realtors*, 294 Kan. 553, 557, 276 P.3d 188 (2012).

## SUMMARY JUDGMENT APPROPRIATE ON CLAIM OF VICARIOUS LIABILITY

Applying these standards to Cady's first claim that Women's Care is vicariously liable for Schroll's actions simply because Women's Care was Schroll's employer, the district court and the Court of Appeals concluded the claim was barred by K.S.A. 40-

3403(h). *Cady*, 2011 WL 2535004, at *5. Before us, Cady does not dispute that the legislature clearly "abrogate[d] vicarious liability where both health care providers, as defined by K.S.A. 40-3401(f), are covered by the Health Care Stabilization Fund." *Glassman v. Costello*, 267 Kan. 509, 523, 986 P.2d 1050 (1999). And Cady does not dispute that both Schroll and Women's Care are health care providers who are qualified for coverage under the Health Care Stabilization Fund created by the HCPIAA.

Cady did raise some alternative arguments before the Court of Appeals regarding whether K.S.A. 40-3403(h) applies under the facts of this case because of an exception provided for in K.S.A. 40-3403(q) (liability for claims relating to health care provider's sexual acts or activity). But those arguments have not been raised before this court, and, consequently, any argument that there was error in granting summary judgment to Women's Care on Cady's claim of vicarious liability based on K.S.A. 40-3403(q) has been waived. See *Martin v. Naik*, 297 Kan. 241, 245, 300 P.3d 625 (2013) (argument addressed by Court of Appeals but not raised in petition for review is waived).

Exceptions placed aside, we have no qualms concluding that under K.S.A. 40-3403(h) Women's Care has no vicarious liability simply because it was Schroll's employer. See Black's Law Dictionary 998 (9th ed. 2009) (defining "vicarious liability" as "[l]iability that a supervisory party [such as an employer] bears for the actionable conduct of a subordinate or associate [such as an employee] based on the relationship between the two parties").

## INDEPENDENT LIABILITY

Consequently, our focus is on Cady's contention that Women's Care is *independently* or *directly* liable for its own conduct, namely, failing to supervise Schroll in order to prevent him from engaging in inappropriate conduct with her. While Cady made broader claims in her petition against Women's Care, such as negligently failing to inform her of Schroll's prior disciplinary record, she limits the issue in her brief to this court to whether the Court of Appeals erred because "Kansas law and the facts support plaintiff's claim that defendant had a duty to supervise its physician employee."

Hence, any other claim is waived. See *Miller v. Johnson*, 295 Kan. 636, 688, 289 P.3d 1098 (2012).

In arguing that Women's Care should be independently liable because of its failure to supervise Schroll, Cady relies on *Marquis v. State Farm Fire & Cas. Co.*, 265 Kan. 317, 334-35, 961 P.2d 1213 (1998), and its holding that a Kansas employer who negligently hires, trains, and supervises employees can be directly liable because of the employer's negligence, as opposed to being vicariously liable on the theory that the employer, as the master of the negligent party, is responsible for an employee's negligence. See, e.g., *Schmidt v. HTG, Inc.*, 265 Kan. 372, Syl. ¶ 10, 961 P.2d 677, *cert. denied* 525 U.S. 964 (1998); *Kansas State Bank & Tr. Co. v. Specialized Transportation Services, Inc.*, 249 Kan. 348, Syl. ¶ 1, 819 P.2d 587 (1991); *Plains Resources, Inc. v. Gable*, 235 Kan. 580, 590, 682 P.2d 653 (1984).

The Court of Appeals recognized the distinction between vicarious and direct liability. But the Court of Appeals also noted that "neither *Marquis* nor any other case has held that a claim for damages based on negligent supervision does not 'arise out of' the wrongful acts that weren't stopped by better supervision." *Cady*, 2011 WL 2535004, at *2. This point was significant, according to the Court of Appeals, because it was considering an issue of "statutory interpretation involving K.S.A. 40-3403(h), not whether Kansas law provides a separate claim for negligent supervision," and the statute could and did bar all responsibility for damages "aris[ing] out of the independent acts of another healthcare provider." 2011 WL 2535004, at *2, 5. In interpreting K.S.A. 40-3403(h), the Court of Appeals viewed "the key terms" as " 'responsibility' and 'arising out of.' " 2011 WL 2535004, at *2.

First addressing the phrase "arising out of," the Court of Appeals stated:

"Certainly much narrower terms could have been used, such as 'caused by' or 'directly caused by' or 'solely caused by.' But the legislature chose 'arising out of.' Other courts have recognized that 'arising out of' is a broad term that should reasonably be interpreted broadly. [Citations omitted.] Even if, as Cady alleges, Women's Care might have prevented Schroll's improper conduct through better

supervision, we think it clear that her claims arose out of his conduct." 2011 WL 2535004, at °2.

Turning to the term "responsibility," the Court of Appeals acknowledged Cady's argument that the word "vicarious" modifies both the words "liability" and "responsibility" and that vicarious liability is distinct from independent or direct liability. But the Court of Appeals noted that this interpretation of K.S.A. 40-3403(h) was rejected in *McVay v. Rich*, 255 Kan. 371, 377-78, 874 P.2d 641 (1994), and *Lemuz v. Fieser*, 261 Kan. 936, 940-41, 933 P.2d 134 (1997). In those cases, this court interpreted K.S.A. 40-3403(h) as absolving a hospital from vicarious liability and any independent responsibility arising from the professional services of another health care provider covered by the HCPIAA.

The Court of Appeals also rejected Cady's argument that this holding was altered in *Aldoroty v. HCA Health Services of Kansas, Inc.*, 265 Kan. 666, 962 P.2d 501(1998). The Court of Appeals concluded the opinion in *Aldoroty* was not inconsistent with *McVay* or *Lemuz* but rather was distinguishable from those decisions because the defendant hospital in *Aldoroty* was held liable for "negligently render[ing] direct medical care to a patient," a duty that did not " 'arise out of' another provider's conduct or treatment." *Cady*, 2011 WL 2535004, at *4.

Finally, the Court of Appeals concluded:

"We see no reason to modify the understanding of the word 'responsibility' that is consistently found in the two opinions of *McVay* and in *Lemuz*. First, when the legislature fails to modify a statute to avoid a standing judicial construction of the statute, we presume the legislature intended the statute to be interpreted as we have done. [Citation omitted.] Second, this interpretation is in line with the broad purpose of the Health Care Provider Insurance Availability Act, K.S.A. 40-3401 *et seq.*, which was designed to lessen a perceived crisis in medical-malpractice claims by placing some limits on claims while also providing adequate insurance coverage to pay when medical negligence caused injury. [Citations omitted.]" *Cady*, 2011 WL 2535004, at *4.

In asking us to reverse the Court of Appeals' and district court's decisions, Cady presents several alternative arguments: (1) *McVay* and *Lemuz* are contrary to the language of K.S.A. 40-3403(h) and should be overruled; (2) those decisions are distinguishable and

should not be applied here; (3) the holding and rationale of those decisions was altered by this court's subsequent decisions in *Aldoroty*, which was discussed by the Court of Appeals, and *Glassman*, which was cited to the Court of Appeals but not discussed in its opinion; and (4) under *Aldoroty* and *Glassman* Women's Care is not entitled to summary judgment.

### 1. *Interpretation of K.S.A. 40-3403(h)*

First, we consider Cady's argument that this court erroneously interpreted K.S.A. 40-3403(h) in the decisions in *McVay* and *Lemuz*. To address these arguments, we must examine the language of the statute and the reasoning behind the holdings in *McVay* and *Lemuz*. We begin with a discussion of the terms of K.S.A. 40-3403(h). For ease of reference, we will set it out again, this time in full. It states:

> "A health care provider who is qualified for coverage under the fund shall have *no vicarious liability or responsibility* for any injury or death *arising out of* the rendering of or the failure to render professional services inside or outside this state by any other health care provider who is also qualified for coverage under the fund. The provisions of this subsection shall apply to all claims filed on or after July 1, 1986." (Emphasis added.)

As we have noted, Cady does not dispute that both Women's Care and Schroll are health care providers qualified for coverage under the fund. See K.S.A. 40-3401(f) (definition of "health care provider"). Her arguments focus on other portions of K.S.A. 40-3403(h), in particular the phrases "no vicarious liability or responsibility" and "for any injury or death *arising out of* the rendering of or the failure to render professional services . . . by any other health care provider." (Emphasis added.)

A few fundamental rules govern our interpretation of these phrases. The most fundamental rule of statutory interpretation is that the intent of the legislature governs if that intent can be ascertained. This court must first attempt to ascertain legislative intent by reading the language of the statute and giving common words their ordinary meanings. When a statute is plain and unambiguous, this court does not speculate as to the legislative intent behind it and will not read into the statute something not readily

found in it. *Stewart Title*, 294 Kan. at 557. But when the statute's language or text is unclear or ambiguous, this court employs "canons of construction, legislative history, or other background considerations to divine the legislature's intent and construe the statute accordingly. [Citation omitted.]" 294 Kan. at 564-65.

K.S.A. 40-3403(h) falls under the category of a statute that is unclear and ambiguous. The ambiguity arises because both of the phrases on which we focus are susceptible to multiple meanings.

As to the first phrase, as she did before the Court of Appeals, Cady contends the word "vicarious" modifies both "liability" and "responsibility." She urges the application of a general rule of syntax under which "an initial modifier 'will tend to govern all elements in the series unless it is repeated for each element.' " *Washington Educ. Ass'n v. National Right to Work Legal Defense Foundation, Inc.*, 187 Fed. Appx. 681, 682 (9th Cir. 2006) (unpublished opinion) (quoting The American Heritage Book of English Usage 53 [1996]). This court has, on occasion, applied this rule when interpreting a statute. *E.g., Rounsavell v. Tipton*, 209 Kan. 366, 367-68, 497 P.2d 108 (1972) (in statute requiring service by " 'restricted registered or certified mail,' " the adjective "restricted" modified both "registered" and "certified mail"); *Hulme v. Woleslagel*, 208 Kan. 385, 390, 395, 493 P.2d 541 (1972) (in statute requiring change of judge for " 'personal bias, prejudice, or interest of the judge,' " the word "personal" appeared "as an adjective modifying the nouns bias, prejudice, or interest").

On the other hand, a general rule of statutory construction provides that a court should not "read out" words in a statute. *Unruh v. Purina Mills*, 289 Kan. 1185, 1194, 221 P.3d 1130 (2009). Under this rule, we must consider the import of the word "responsibility" following the word "liability." Black's Law Dictionary 1427 (9th ed. 2009) defines "responsibility" as "liability." Thus, if Cady's interpretation of K.S.A. 40-3403(h) is correct, the statute would be read to eliminate "vicarious liability" and then to repeat itself. This reading essentially renders meaningless the legislature's use of the word "responsibility."

Although the *McVay* court did not discuss this rule of statutory construction, it opted to make the word "responsibility" meaning-

ful. It determined the word "vicarious" modifies only the word "liability" and not the word "responsibility," making the legislature's use of the two terms significant because a different meaning is conveyed even though the two terms overlap in meaning. This conclusion was summarized in *Lemuz*, 261 Kan. at 940, when the court stated: "*McVay* interpreted the [term "responsibility"] as absolving a hospital not just from vicarious liability but from any responsibility, including independent liability, for the acts of a physician."

Clearly, there is enough uncertainty in the meaning of the phrase "vicarious liability or responsibility" that it can be considered ambiguous. Likewise, the phrase "arising out of" is ambiguous as demonstrated by decisions of this court that have applied the phrase in multiple ways.

One interpretation of the phrase "arising out of" that is favorable to Cady can be found in *Marquis*, 265 Kan. 317, the case Cady relies on to support the distinction between vicarious liability and liability for an employer's independent tort. In *Marquis*, this court was asked to determine whether a contractor's insurance policy provided coverage related to damages arising from an automobile accident when the claim was that the employer negligently hired, retained, or supervised the employee who was driving at the time of the accident. The contractor's policy contained an exclusion for " 'bodily injury or property damage *arising out of* the ownership, maintenance, use or entrustment of others of any aircraft, auto, or watercraft owned or operated by or rented or loaned to any insured.' " (Emphasis added.) 265 Kan. at 328. The insurance company argued this provision excluded any claims for negligent hiring, retention, or supervision of the automobile driver because such claims arose out of an accident involving the use of an automobile owned by the insured. The *Marquis* court disagreed. The court determined "the theory of liability rather than the cause of the accident governs coverage." 265 Kan. at 328-29.

In reaching this conclusion, the *Marquis* court noted it was adopting a minority reading of the phrase "arising out of." 265 Kan. at 329-30. The majority view of other state courts construing the same exclusion in contractors' policies focuses on causation, not on

the theory of liability. The majority view is that " 'the claim for negligent supervision is not independent of, but inextricably intertwined with, the employee's use of the truck, [and] any breach by the employer to supervise such use is necessarily deemed to have arisen therefrom.' [Citation omitted.]" 265 Kan. at 330.

But the *Marquis* court felt compelled to reject the majority view because of rules governing the interpretation of exclusions in insurance contracts. One of these rules states that "[g]enerally, exceptions, limitations, and exclusions to insurance policies require narrow construction on the theory that the insurer, having affirmatively expressed coverage through broad promises, assumes the duty to define any limitations on that coverage in clear and explicit terms." *Marquis*, 265 Kan. at 327. In applying this rule, the court noted that the contractor's insurance policy specifically excluded negligent entrustment but not negligent supervision. Yet, "Kansas law recognizes negligent supervision as a separate and distinct theory in addition to theories of negligent hiring and negligent retention," just as it recognizes the separate theory of negligent entrustment. 265 Kan. at 331. Further, in a separate homeowner's policy held by the insured, the same insurance company specifically excluded negligent supervision. Based on these comparisons, the court concluded the insurance company had recognized the viability of negligent supervision as a theory of liability and had also recognized the need to exclude the theory from coverage in its homeowner's policy. Nevertheless, it had not specifically defined the limitation on coverage in its contractor's policy and therefore should not be allowed to claim the exclusion. 265 Kan. at 331.

In *Crist v. Hunan Palace, Inc.*, 277 Kan. 706, 714-16, 89 P.3d 573 (2004), this court questioned the reasoning in *Marquis* but applied stare decisis principles and decided its holding controlled the contract interpretation issue in that case. The discussion in *Crist* included references to Kansas cases in which the *Marquis* holding had not been extended. 277 Kan. at 714. This line of other cases has more application in this case than does *Marquis* because the rules regarding insurance exclusions that controlled *Marquis* do not drive the interpretation of K.S.A. 40-3403(h). And in circumstances where an insurance exclusion is not at issue, Kansas

has interpreted the phrase "arising out of" in a manner that is consistent with the majority rule of looking at causation rather than the theory of liability. Several of these cases arise in the context of determining insurance coverage rather than insurance exclusion.

For example, the Court of Appeals has recognized the words "arising out of" are "very broad, general, and comprehensive terms . . . ordinarily understood to mean 'originating from,' 'having its origin in,' 'growing out of' or 'flowing from.'" *Garrison v. State Farm Mut. Auto. Ins. Co.*, 20 Kan. App. 2d 918, 923, 894 P.2d 226 (quoting *Cameron Mut. Ins. Co. v. Ward*, 599 S.W.2d 13, 15 [Mo. App. 1980]), *aff'd* 258 Kan. 547, 907 P.2d 891 (1995). In *Garrison*, the issue was whether an injury arose out of the use of an automobile when a hunter accidentally discharged his shotgun while exiting a car, injuring the car's driver. This court, in affirming the Court of Appeals' determination that the phrase "arising out of" conveyed a broad concept of causation, held the injury "was a natural and reasonable incident arising out of the use of the car for hunting." 258 Kan. at 554.

This court adopted a similar focus on causation when interpreting two insurance statutes in *Farmers Ins. Co. v. Southwestern Bell Tel. Co.*, 279 Kan. 976, 982, 113 P.3d 258 (2005), stating: "The legislature's use of the phrase 'arising out of' in K.S.A. 40-284 and K.S.A. 40-3104(f) supports a broad definition" of the term "liability" when considering if a claim arises out of the use of an automobile. Likewise, in *Pestock v. State Farm Auto. Ins. Co.*, 9 Kan. App. 2d 188, 189, 674 P.2d 1062 (1984), the Court of Appeals held "[t]he phrase 'arising out of the . . . use of' imparts a more liberal concept of causation than 'proximate cause.' [Citation omitted.]"

This focus on causation is consistent with the approach adopted in *McVay*, 255 Kan. 371. In that case, Anita McVay alleged that a hospital had negligently granted or continued a physician's privileges when it knew or should have known the physician was incompetent. In addition, McVay asserted that the hospital was negligent in not properly providing or performing a quality assurance program. Despite these claims of direct liability against the hospital for its own negligence, this court noted that McVay "would have [had] no claim against the hospital if she had not been injured" by

the physician, her claim against the hospital was "derivative of and dependent upon her claim" against the physician, and her "injury arose out of the rendering of professional services" by the physician. 255 Kan. at 376-78.

This court in *McVay* did not expand on its reasoning but endorsed the analysis of the Court of Appeals in the decision under review, *McVay v. Rich*, 18 Kan. App. 2d 746, 859 P.2d 399 (1993). The Court of Appeals had adopted the focus on causation after examining the legislative history of K.S.A. 40-3403(h). In determining the significance of that legislative history, the *McVay* Court of Appeals looked to this court's opinion in *Bair v. Peck*, 248 Kan. 824, 845, 811 P.2d 1176 (1991), in which this court held that K.S.A. 40-3403(h) does not violate Sections 1, 5, or 18 of the Kansas Constitution Bill of Rights.

The *Bair* court explained that K.S.A. 40-3403 "was originally enacted in 1976 to address the perceived medical malpractice crisis, including the problems of obtaining and maintaining affordable malpractice insurance and maintaining the availability of medical services in Kansas." 248 Kan. at 827. Ten years later, however, those goals had not been achieved. "In response to the continued increase in the cost of obtaining medical malpractice insurance and after recommendations of the Special Committee on Medical Malpractice [citation omitted], the legislature enacted additional major tort reforms in 1986," including the provision that was codified as subsection (h) of K.S.A. 40-3403. 248 Kan. at 828.

The Special Committee explained its purpose in proposing K.S.A. 40-3403(h) in its report to the legislature, stating:

" 'The Committee notes that licensees in medicine and surgery are now required to pay medical malpractice premiums and surcharges as individuals and, additionally, must pay these costs for professional associations they may belong to (albeit at a reduced rate). The Committee believes this dual coverage requirement is not necessary to protect the public welfare and is aggravating a problem that already exists with high insurance costs.' [Proposal No. 47—Medical Malpractice,] Report on Kansas Legislative Interim Studies to the 1986 Legislature, p. 859 [(December 1985)]." *Bair*, 248 Kan. at 833.

The Special Committee also explained its intent regarding the function of K.S.A. 40-3403(h), noting:

" '[Recommendation] *Other Insurance Changes.* The bill requires partnerships of persons who are health care providers to obtain the mandatory insurance coverages so that vicarious liability of one health care provider for another may be abolished if both are covered by the Fund. Further, insurers may exclude from coverage liability for those health care providers already required to maintain professional liability insurance.' [Report on Kansas Legislative Interim Studies to the 1986 Legislature,] p. 861." *Bair,* 248 Kan. at 833.

The first sentence of this recommendation is clearly limited to vicarious liability, but the second sentence can be read to express a broader intent to eliminate the need for double coverage. The *McVay* Court of Appeals read this broader intent as encompassing responsibilities that are not strictly vicarious liability, as long as the injury arose from the rendering of or failure to render professional services by another health care provider required to obtain insurance coverage as mandated by the HCPIAA. 18 Kan. App. 2d at 752-53. Recognizing this legislative intent, the Court of Appeals in *McVay* concluded:

"If a hospital's insurer knows the hospital will only be liable for the negligence of its employees and agents who are not qualified under the fund, malpractice insurance rates should be stabilized.

"K.S.A. 1992 Supp. 40-3403(h) applies to all health care providers. Further, the statute eliminates not only vicarious liability but also *responsibility* for any injury arising out of the rendering of or failure to render professional services by another health care provider who is also covered by the fund. [Citation omitted.]" 18 Kan. App. 2d at 752.

In endorsing this rationale on petition for review, this court's *McVay* decision essentially resolved the ambiguities in K.S.A. 40-3403(h) in a way that furthers the legislative intent of eliminating the need for a health care provider to obtain insurance coverage for damages arising out of another health care provider's care and treatment of a patient even if a theory of direct or independent liability has been asserted.

But Cady also argues the *McVay* interpretation violates the rule of statutory construction that restrains a court from reading words into a statute. See *Bergstrom v. Spears Manufacturing Co.,* 289 Kan. 605, 609, 214 P.3d 676 (2009). According to her, the *McVay* holding, which was reiterated in *Lemuz,* 261 Kan. 936, requires adding the word "other" before the word "responsibility." We dis-

agree. Rather than add a word, this court simply declined to modify the word "responsibility" with the word "vicarious" and gave the word "responsibility" its ordinary, unqualified meaning. An additional word, such as "other," might have made the statute clearer, but additional words did not have to be added to interpret the statute in a manner consistent with the apparent legislative intent.

In summary, none of Cady's arguments persuade us that this court erroneously interpreted K.S.A. 40-3403(h) in *McVay* and *Lemuz*. As our discussion has indicated, K.S.A. 40-3403(h) is obviously ambiguous. Compare *Marquis v. State Farm Fire & Cas. Co.*, 265 Kan. 317, 328-29, 961 P.2d 1213 (1998) (interpreting phrase "arising out of" to require focus on "the theory of liability rather than the cause of the accident") with *Garrison*, 258 Kan. at 554 (interpreting phrase "arising out of" as incorporating broad concept of causation). Therefore, the *McVay* Court of Appeals had appropriately consulted legislative history to resolve the ambiguities in K.S.A. 40-3403(h). Further, as we have discussed, this court's interpretation of the phrase "arising out of" in *McVay*, 255 Kan. 371, is consistent with the interpretation of that phrase by this court in contexts other than insurance exclusions and by a majority of other courts in all contexts. Consequently, we find no reason to overrule *McVay* and *Lemuz* as Cady asks us to do. See *Miller v. Johnson*, 295 Kan. 636, 653, 289 P.3d 1098 (2012) ("The doctrine of stare decisis maintains that once a point of law has been established . . . [a] court of last resort will follow that rule of law unless clearly convinced it was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent.").

Instead, we reaffirm the holding in those cases that K.S.A. 40-3403(h) absolves a health care provider not just from vicarious liability but from any responsibility, including independent liability, where the injured party's damages are derivative of and dependent upon the rendering of or the failure to render professional services by another health care provider.

## 2. McVay *and* Lemuz *Are Not Distinguishable*

Alternatively, Cady argues that *McVay v. Rich*, 255 Kan. 371, 874 P.2d 641 (1994), and *Lemuz v. Fieser*, 261 Kan. 936, 933 P.2d 134 (1997), are factually distinguishable and should not be applied. She notes that those decisions involved claims where a plaintiff sued a hospital rather than a physician's group; involved independent contractors as opposed to employees; arose on claims based on the corporate negligence theory rather than on a failure to supervise theory; and were based in part on K.S.A. 65-442(b), a statute that does not apply to Women's Care.

Cady is correct that her claims are distinguishable from those in *McVay* and *Lemuz* because Schroll was an employee of Women's Care, which is a physician's group, as opposed to an independent contractor with a hospital, which was the situation in *McVay* and *Lemuz*. And the claims in *McVay* were based on a theory often referred to as corporate negligence, which relates, at least in part, to the duty to " 'exercise reasonable care to employ a competent and careful contractor . . . .' Restatement (Second) of Torts § 411 (1963)." *McVay*, 255 Kan. at 376-77. Nevertheless, these distinctions are not as meaningful as Cady suggests. The language of K.S.A. 40-3403(h) does not premise immunity on the type of health care providers involved, the nature of the relationship between the two health care providers, or the nature of the theory of liability.

Regarding the type of health care provider involved, while K.S.A. 40-3403(h) is ambiguous in many respects, the legislature clearly did not intend to distinguish between hospitals and medical practice groups formed by individual providers or any other health care provider. K.S.A. 40-3401(f) defines the term "health care provider" to include various licensed individuals, medical care facilities, professional corporations and limited liability companies organized by health care providers, and other entities.

Likewise, there is no indication the legislature intended to distinguish between employee-employer, independent contractor, or even less formal relationships. For example, focusing on the term "vicarious liability," the term Cady admits is unambiguous, Kansas law historically recognized that a "physician may be vicariously li-

able for the negligence of other members of the health care team under the so-called 'captain of the ship' theory." *Glassman v. Costello*, 267 Kan. 509, 523, 986 P.2d 1050 (1999); see, *e.g.*, *Oberzan v. Smith*, 254 Kan. 846, 850, 869 P.2d 682 (1994) (recognizing that as "captain of the ship" surgeon exercising staff privileges at hospital was liable for actions of hospital employees assisting with surgery); *Voss v. Bridwell*, 188 Kan. 643, Syl. ¶ 3, 364 P.2d 955 (1961) (surgeon exercising staff privileges had liability for anesthetist in hospital's residency program). The captain-of-the-ship theory applied even though the surgeon did not employ or contract with the other health care providers in the operating room. Yet in *Glassman*, one of the cases relied on by Cady, this court recognized that K.S.A. 40-3403(h) abrogated vicarious liability based on the captain-of-the-ship theory. 267 Kan. at 523. Clearly, K.S.A. 40-3403(h) makes no distinction based on the nature of the relationship between the health care providers, and we find no basis to distinguish *McVay* or *Lemuz* on this basis.

Nor does K.S.A. 40-3403(h) impose conditions relating to the theory of liability asserted in a petition. Instead, as we have discussed, the focus is on the source or cause of the plaintiff's injuries, not on the theory of liability. In addition, while McVay's claims fell within the scope of the corporate negligence doctrine, this court explicitly declined to reach the question of whether Kansas should adopt the corporate negligence theory because the "unambiguous language of K.S.A. 65-442(b) and K.S.A. 40-3403(h) requires the conclusion that those statutes bar McVay's claim[s] against the hospital." *McVay*, 255 Kan. at 377. As we have discussed, this decision was based, at least in part, on the court's focus on causation rather than the nature of the theory. Likewise, in this case we need not determine whether a duty to supervise theory applies in the situation of a licensed physician who is a shareholder of a corporation. Rather, assuming the theory is viable, we must determine if under the facts Women's Care can be liable as a matter of law.

Also, there are obvious parallels between the claims made by McVay and those made by Cady. In *McVay*, this court recognized that the term "corporate negligence" was an umbrella term encompassing many "independent duties a hospital may owe to a patient,"

including such things as the duty to exercise reasonable care in granting and renewing staff privileges to independent-contractor physicians, "the duty to monitor and review patients' treatment and progress[,] and the duty to make and enforce rules." 255 Kan. at 375. In many respects, these duties are similar to the duties Cady claims Women's Care owed to her—the duty to retain competent agents and to supervise.

Further, regardless of whether the liability arises from the negligent hiring and supervision of an independent contractor or an employee-employer relationship, the policy behind imposing liability on the principal is the same: making liable the entity or person who was in a position to protect the patient, who profited from the business relationship with the injured patient, and who is often best able to pay for the damages. See *Marquis*, 265 Kan. at 331 (discussing duty to supervise); *McVay*, 255 Kan. at 377 (discussing corporate negligence); *Plains Resources, Inc. v. Gable*, 235 Kan. 580, 590, 682 P.2d 653 (1984) (discussing duty to hire and retain competent employees); see also *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 523, 622 N.E.2d 788 (1993) (discussing policy reasons for recognizing vicarious liability of hospital for acts of independent-contractor physician). We recognize that K.S.A. 40-3403(h) arguably undermines the public policy behind these theories of liability and diminishes the protections otherwise available to patients. But "courts 'are not free to act on . . . [their own] view of wise public policy' in matters governed by legislation. [Citation omitted.] Courts should instead 'leave the guidance of public policy through statutes to the legislature.' [Citations omitted.]" *In re Marriage of Hall*, 295 Kan. 776, 784, 286 P.3d 210 (2012). Our task is to determine if there is any reason to discern a legislative intent to distinguish between employees and independent contractors or various theories of liability, and we can find none.

The final distinction argued by Cady is that K.S.A. 65-442(b), which is discussed extensively in *McVay* and *Lemuz*, is not at issue in this case. K.S.A. 65-442(b) applies only to "licensed medical care facilit[ies]," and Women's Care does not fall within that term's definition. See K.S.A. 65-425(h) (defining "medical care facility" to generally mean "a hospital, ambulatory surgical center or recu-

peration center"). Cady makes a two-fold argument: (1) the application of K.S.A. 65-442(b) and its clear intent infected the *McVay* court's reading of K.S.A. 40-3403(h), and (2) K.S.A. 65-442(b) demonstrates that the legislature knew how to clearly provide for immunity from liability but did not do so in K.S.A. 40-3403(h).

We agree with Cady that K.S.A. 65-442(b) is a clearer and less ambiguous statute. K.S.A. 65-442(b) states:

"There shall be no liability on the part of and no action for damages shall arise against any licensed medical care facility because of the rendering of or failure to render professional services within such medical care facility by a person licensed to practice medicine and surgery if such person is not an employee or agent of such medical care facility."

As Cady indicates, the phrases "no liability" and "no action for damages" are crystal clear. And in interpreting statutes we frequently point to parallel statutes and note that the language in one statute may illustrate that the legislature knows how to state something that is omitted in another statute. See *State v. Nambo*, 295 Kan. 1, 4-5, 281 P.3d 525 (2012). Nevertheless, using different language in two statutes does not necessarily mean that both cannot be interpreted in a manner consistent with legislative intent. And although the *McVay* court discussed both statutes, in large part it analyzed them separately and reached conclusions specific to K.S.A. 40-3403(h). Moreover, as we have discussed, the legislative history supporting the *McVay* court's interpretation of K.S.A. 40-3403(h) is specific to that provision. Finally, as revealed in the decisions in *Aldoroty v. HCA Health Services of Kansas, Inc.*, 265 Kan. 666, 962 P.2d 501 (1998), and *Glassman*, 267 Kan. 509, which we will discuss in more detail in the next section of this opinion, we do not believe K.S.A. 40-3403(h) was intended to have the same scope as K.S.A. 65-442(b). While K.S.A. 65-442(b) bars all of a medical care facility's liability for a physician's care and treatment of a patient if the physician is not an employee or agent of the medical care facility, K.S.A. 40-3403(h) limits the bar of liability only to damages arising out of the other health care provider's actions or inactions. As *Aldoroty* and *Glassman* demonstrate, through the causation requirement in K.S.A. 40-3403(h) the legislature left open the possibility of two health care providers having

liability. Thus, there was a reason for the legislature to use different language in the two statutes.

Simply put, K.S.A. 40-3403(h) does not premise its bar of responsibility based on any of the distinctions Cady attempts to make between the facts of this case and those involved in *McVay* or *Lemuz*.

### 3. Aldoroty *and* Glassman *Did Not Overrule* McVay *and* Lemuz

Cady further suggests that *Aldoroty* and *Glassman* changed the way this court interprets and applies K.S.A. 40-3403(h). We, therefore, next consider the impact of those decisions and conclude that Cady's reading of the holdings in those cases is shaded by her attempt to impose the *Marquis* reading of "arising out of" on our interpretation of K.S.A. 40-3403(h).

In *Aldoroty*, the plaintiff sued three radiologists and a hospital, alleging that negligence delayed his diagnosis of lymphoma. Aldoroty was an employee of the hospital and participated in annual health audits provided to employees. Aldoroty's theory of liability was that his illness had progressed because radiologists failed to detect changes in chest X-rays and that their failure was at least partially attributable to the hospital's failure to furnish the radiologists with previous films for comparison. Plaintiff's experts faulted the radiologists on several grounds, including reading X-rays without verifying whether there were previous films that could be compared. As to the hospital's liability, even the hospital did not dispute its duty to retrieve the records and make the previous X-rays available to the radiologists.

One argument advanced by the hospital was that it could not be held liable under *McVay* and K.S.A. 40-3403(h) unless it was 100 percent at fault because it could not be held liable for injuries arising out of the radiologists' negligence. And the hospital contended it could not be 100 percent at fault because the " '[p]laintiff's theory and the facts dictate that at least some negligent act by a physician was required for injury to result.' " *Aldoroty*, 265 Kan. at 680.

The *Aldoroty* court was not persuaded by the hospital's arguments. The court distinguished *McVay*, noting that Aldoroty was

not seeking to hold the hospital liable for the radiologists' actions but for the failure of hospital employees to retrieve prior X-rays from storage and furnish them to the radiologists. The court also noted that the hospital's "duty and the radiologists' duty were close links in the same small chain, and it was up to the jury to compare their fault." *Aldoroty*, 265 Kan. at 682.

The Court of Appeals in this case rejected Cady's arguments that *Aldoroty* effectively overruled *McVay*. The Court of Appeals reasoned:

"There is no indication in *Aldoroty* that the court considered its opinion in that case in any way to be inconsistent with *McVay* or *Lemuz*. We see nothing inconsistent in finding the hospital could be sued when it negligently rendered direct medical care to a patient (by failing to provide the records of past X-rays when it had undertaken a duty to do so) even though it may not be sued for negligent supervision of another covered provider. Under *Aldoroty*, a healthcare provider may be liable for specific acts of negligence where the duty is separate from the services of another healthcare provider. That liability doesn't 'arise out of' another provider's conduct or treatment. [Citation omitted.]" *Cady v. Schroll*, No. 103,499, 2011 WL 2535004, at *4 (Kan. App. 2011) (unpublished opinion).

Cady, in suggesting the Court of Appeals' reading of *Aldoroty* was in error, notes that the *Aldoroty* court distinguished *McVay* and *Lemuz* because they were "confined to application to the corporate negligence theory." *Aldoroty*, 265 Kan. at 682. But Cady ignores the reason the *Aldoroty* court felt the distinction was important.

The *Aldoroty* court noted that the duty alleged in *McVay* was "to select and retain only competent and careful physicians" and "[t]hat duty arose in a function completely separate from the surgical services provided by the hospital." *Aldoroty*, 265 Kan. at 682. In contrast, Aldoroty "did not seek to hold [the hospital] liable for his physical harm caused by the hospital's negligence in selecting and retaining the radiologists" or even its own employees. 265 Kan. at 682. Rather, Aldoroty alleged hospital employees, who were not medical providers required to obtain insurance under the HCPIAA, owed him a duty related to his care and treatment that was independent of the duty owed by the radiologists. And Aldoroty's injuries arose at least in part because the hospital's employees

were negligent in caring for him, not just in failing to appropriately retain or supervise an employee or independent contractor. 265 Kan. at 682; see *Culp v. Sifers*, 550 F. Supp. 2d 1276, 1285 (D. Kan. 2008) (granting summary judgment in favor of professional association appropriate where plaintiff failed to direct the court to "any particular duty owed to plaintiff" related to the course of treatment and the "plaintiff would have no claim against the professional association if [the surgeon] had not negligently injured her").

The same distinction can be made between *McVay* and the other decision on which Cady relies, *Glassman*, 267 Kan. 509, a case not specifically discussed by the Court of Appeals. As in *Aldoroty*, *Glassman* arose after two health care providers were negligent in the care and treatment of a patient. The case involved an anesthesia-related death of a patient during a cesarean section delivery of her healthy child. The patient's heirs-at-law sued the certified registered nurse anesthetist and the obstetrician. The heirs-at-law claimed the obstetrician was negligent in (1) failing to direct and monitor the nurse anesthetist as required by K.S.A. 65-1158(b) (stating "[a] registered nurse anesthetist shall perform duties and functions in an interdependent role as a member of a physician . . . directed health care team"); (2) beginning surgery after the failure of a spinal anesthesia; (3) ignoring the nurse anesthetist's report that the patient was not intubated; and (4) continuing with surgery when he knew or should have known the patient was inappropriately intubated.

The heirs-at-law conceded that the adoption of K.S.A. 40-3403(h) meant the obstetrician could not be vicariously liable as he historically would have been under the captain-of-the-ship doctrine. Nevertheless, the survivors contended they were seeking to hold the obstetrician liable for his individual actions and inactions in the operating room, not just for vicarious liability. This court agreed, noting that the abrogation of liability in K.S.A. 40-3403(h) did not mean, as the obstetrician had argued, that there was no possible liability. Rather, the obstetrician could be liable "in light of the individual technical duties of the different health care providers." 267 Kan. at 526.

The court explained that the patient "died due to hypoxia brought about by inadequate anesthetic induction and a failure to intubate prior to initiation of the cesarean section" and, while the induction and intubation were tasks performed by the nurse anesthetist, the obstetrician had a statutorily imposed "duty of direction." *Glassman,* 267 Kan. at 513, 526. Rather than communicating with the anesthetist to assure the induction was adequate and the patient had been intubated before initiating the surgery, the surgeon conducted the cesarean section. There was evidence the obstetrician had been told the patient was not intubated and that the obstetrician should have known from the tones emitted by the oximeter that the patient's level of oxygen was decreasing. These factual issues suggested a jury should determine the comparative fault of the two health care providers, both of whom had some active role in causing the mother's death. See 267 Kan. at 523-24, 526.

Thus, the obstetrician's liability did not arise from the nurse anesthetist's negligence but from his own negligent care and treatment of the patient. In other words, the heirs' claim against the obstetrician did not arise out of the nurse anesthetist's actions but out of the obstetrician's own actions, and K.S.A. 40-3403(h) did not apply.

Because both *Aldoroty* and *Glassman* dealt with situations where two health care providers were negligent in providing care and treatment to a patient and the patient's injuries arose from the actions of each provider, those cases present a different situation than *McVay* or *Lemuz.* In *McVay* and *Lemuz,* the injuries arose out of the actions of the physician, and the hospital's liability would have arisen only from the failure to supervise the physician. Given these differences, we reject Cady's argument that *Aldoroty* and *Glassman* altered the holdings in *McVay* and *Lemuz.*

4. Aldoroty *and* Glassman *Do Not Prevent Summary Judgment*

Finally, Cady argues that *Aldoroty* and *Glassman* prevent summary judgment in favor of Women's Care. We disagree.

Cady's claims against Women's Care are more akin to those in *McVay* and *Lemuz* than those in *Aldoroty* and *Glassman.* Cady

makes no claim that any employee of Women's Care who was not covered by the HCPIAA negligently treated her, so we do not have a factual situation like *Aldoroty* and *Glassman*. Instead, her claims against Women's Care for negligent supervision are like those asserted in *McVay*, and all of her claimed damages derive from the alleged wrongful acts of Schroll. Paraphrasing what this court said in *McVay*, Cady "would have [had] no claim against [Women's Care] if she had not been injured" by Schroll, her claim against Women's Care was "derivative of and dependent upon her claim" against Schroll, and her "injury arose out of the rendering of professional services" by Schroll. See *McVay*, 255 Kan. at 376-78. Consequently, K.S.A. 40-3403(h) bars Women's Care's liability, and the district court did not err in granting summary judgment.

Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

JOHNSON, J., concurs in result.