NOT DESIGNATED FOR PUBLICATION

Nos. 115,877
116,147

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

DIETTE MARGARET RAGAIN, f/k/a DIETTE M. BASU,
*Appellee*,

v.

SHILADITYA SANJAY BASU,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; ERIC A. COMMER, judge. Opinion filed June 23, 2017.
Affirmed.

*Richard A. Samaniego*, of Counsel, Young, Bogle, McCausland, Wells & Blanchard, P.A., of
Wichita, for appellant.

*Elaine Reddick*, of Reddick Law Office, of Wichita, for appellee.

Before LEBEN, P.J., PIERRON and BRUNS, JJ.

LEBEN, J.: This is an appeal of post-divorce disagreements between Shiladitya
Sanjay Basu, who goes by "Rana," and Diette Margaret Ragain (formerly Basu). They
have been divorced since 2007 but have had ongoing parenting disputes.

The issues now before us concern the court-ordered parenting plan related to their
9-year-old daughter, Ayanna. We will summarize them briefly in this introduction.

1

Rana asked the district court to hold Diette in contempt for failing to comply with the parenting plan by not returning phone calls promptly and failing to get a passport for Ayanna. The district court denied the motion for contempt because Diette *did* get a passport for Ayanna; it also clarified the orders about phone calls. Rana then filed a motion to enforce the parenting agreement, arguing that Diette didn't tell him about Ayanna's first Holy Communion, failed to return calls promptly, and monitored his phone calls with Ayanna. The district court also denied this motion but ordered the parents into case management. The district court ordered Rana to pay attorney fees for both motions and ordered that he pay 80% of the cost of case management.

On appeal, Rana first argues that the district court shouldn't have denied either of his motions because he showed that Diette had violated the parenting plan. But despite Rana's allegations, Diette substantially complied with the parenting plan: She got Ayanna a passport and she returned phone calls within 24 hours, which is all the parenting plan requires. Second, Rana argues that due process required the district court to hold evidentiary hearings on his claims. But not all cases require full evidentiary hearings— Rana had three separate hearings to argue these issues to the district court, so he wasn't deprived of due process. Third, Rana argues that the district court didn't have authority to award attorney fees—but the plain language of the applicable statute says the court can award attorney fees "as justice and equity may require." See K.S.A. 2016 Supp. 23-2216(a). It's true that this case began as a paternity action and that the paternity issue itself was settled long ago, but post-judgment motions in paternity cases are extremely common, and the attorney-fee statute applies to post-judgment motions in paternity cases as well as to the paternity issue itself. Last, Rana argues that the district court lacked statutory authority to require him to pay 80% of the cost of case management. But the fees of a case manager are one of the "costs" of litigation, so they too may be awarded as justice and equity may require. We find no abuse of discretion in the manner in which the district court assessed case-management costs here. We therefore affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Rana and Diette have been divorced since 2007. After the divorce, they had a third child, Ayanna, born in 2008. Since the parties were no longer married when Ayanna was born, the parties' rights as parents—and their disputes over parenting—have been resolved through a paternity lawsuit. In that proceeding, the trial court's docket as of June 2016 showed 698 separate events (including various filings) and 192 scheduled hearings; we will focus only on the facts relevant to resolving Rana's arguments on appeal.

In October 2015, the district court held hearings on Rana's motion to modify the parties' court-ordered parenting plan. The journal entry of the modified parenting plan was filed on December 31, 2015, after several months of disagreement about its exact terms. The parenting plan covered many topics, but only two are relevant here: international travel and parenting phone time.

Regarding international travel, the district court found that "international travel is a wonderful experience" and ordered that Rana would be allowed to travel internationally with Ayanna during his extended summer parenting time. The plan states that Rana must provide Diette with "a detailed itinerary and emergency contact numbers" at least 90 days before the trip. But under the plan, it's Diette's responsibility to get a passport for Ayanna and to "timely cooperate with any required travel documents (e.g. visa) to facilitate travel."

Regarding phone time, the district court found that, according to the parties, phone calls weren't always returned promptly, so it instructed: "[Y]ou need to put yourself in that other party's position, that if you call to speak to the child, you want your call returned; you need to do the same." The parenting plan gives Rana and Diette the right to call Ayanna when she is with the other parent. In a somewhat garbled provision, the plan says that any missed calls must be "returned promptly, preferably the same day, I [*sic*]

not within 24 hours." Throughout this litigation, both parties and the court have routinely accepted that this provision means that calls must be returned preferably on the same day, and if not, then within 24 hours.

On January 20, 2016, 20 days after the court-ordered parenting plan was filed, Rana filed a contempt motion arguing that Diette hadn't cooperated in getting a passport and wasn't promptly returning phone calls. At a nonevidentiary hearing on March 22, 2016, the court learned that Diette had gotten Ayanna a passport as of February 3, 2016. Regarding phone calls, Rana alleged that Diette wasn't returning phone calls promptly enough and alleged that she once returned a call more than 24 hours later (though Diette disputed that). The district court denied the contempt motion and awarded Diette $500 for attorney fees. It also modified the phone provision by stating that the time for calls would be Tuesdays, Thursdays, and Saturdays between 7:30 and 8 p.m. and that missed calls had to be returned within 24 hours.

Rana then filed a motion for specific findings and to alter or amend the judgment, arguing in part that the district court shouldn't have modified the phone-call provision because his contempt motion wasn't a motion to modify the parenting agreement. After a nonevidentiary hearing on April 12, 2016, the district court vacated the changes it had made to the phone-call order but didn't otherwise change its contempt ruling. The court also clarified the meaning of the phone-call provision in the parenting plan: (1) "phone calls" mean calls to a cell phone, not calls over other devices such as iPads; (2) "reasonable frequency" means three to seven times a week; and (3) "reasonable times of the day" means between 4:30 and 8 p.m. on school days and between 9 a.m. and 8 p.m. on nonschool days.

Then, in May 2016, Rana filed a motion to enforce the parenting plan, alleging that Diette didn't tell him about Ayanna's first Holy Communion, was listening to his calls with Ayanna on a speakerphone, and wasn't returning calls promptly (including one

4

call returned more than 24 hours later). After a nonevidentiary hearing on June 21, 2016, the district court denied the motion to enforce and ordered parties into case management. The district court also ordered Rana to pay $720 in attorney fees for the motion to enforce the parenting plan and 80% of the ongoing cost of case management.

Rana then appealed to our court.

ANALYSIS

I. *The District Court Correctly Denied Rana's Motions for Contempt and to Enforce the Parenting Agreement.*

Rana first argues that the district court shouldn't have denied his motion for contempt or his motion to enforce the parenting plan.

Where there are no factual disputes, we review contempt proceedings under a two-part standard. *In re Marriage of Shelhamer*, 50 Kan. App. 2d 152, 154, 323 P.3d 184 (2014). First, we independently consider whether the alleged conduct constitutes contempt—we owe no deference to the district court on that legal question. 50 Kan. App. 2d at 154. Second, we review any sanctions imposed for an abuse of discretion. 50 Kan. App. 2d at 154. Here, because the district court found that Diette's conduct didn't constitute contempt, it didn't impose sanctions, so only the first standard applies.

The district court's power to hold someone in contempt is important for several reasons: to maintain order in court proceedings, to punish those who show disrespect for the court or its orders, and to enforce its judgments. *In re J.T.R.*, 47 Kan. App. 2d 91, 94, 271 P.3d 1262 (2012); see K.S.A. 20-1201 *et seq.* Direct contempt takes place in the presence of a judge; all other contempt is called "indirect." K.S.A. 20-1202; *Shelhamer*, 50 Kan. App. 2d at 155. In this case, we are concerned with indirect contempt, because

5

Rana alleged that Diette's out-of-court behavior was contemptuous in that she wasn't complying with the court-ordered parenting plan. See K.S.A. 2016 Supp. 20-1204a.

Additionally, contempt cases can be either civil or criminal. *J.T.R.*, 47 Kan. App. 2d at 95. "Civil contempt proceedings are remedial in nature and designed to advance the private right of a litigant won by court order. Any civil contempt penalty is intended to be coercive, and relief can be achieved only by compliance with the order." 47 Kan. App. 2d at 95. Sanctions for criminal contempt, on the other hand, are meant to punish the offender for disrespecting or disobeying the court. *Shelhamer*, 50 Kan. App. 2d at 155 (citing *State v. Jenkins*, 263 Kan. 351, 358, 950 P.2d 1338 [1997]). In this case, we are concerned with civil contempt, because Rana's contempt motion was aimed at coercing Diette to comply with the court-ordered parenting plan—he asked the court to impose a jail sentence that would be revoked if Diette complied with the court order.

Rana's specific contempt allegations were that Diette didn't comply with the court-ordered parenting plan because she failed to get Ayanna a passport and failed to have Ayanna return phone calls promptly. We first review whether Diette's conduct related to the passport was contemptuous. The parenting plan states that Diette will maintain a passport for Ayanna and "shall timely cooperate with any required travel documents (e.g. visa) to facilitate travel." Rana, for his part, must provide Diette with at least 90 days' notice of international travel including a detailed itinerary and emergency phone numbers. But the parties agreed at the contempt hearing that Diette had obtained a passport for Ayanna. Because Diette complied with this provision of the parenting plan, the district court correctly determined that her conduct wasn't contemptuous and denied Rana's contempt motion on this ground.

Rana argues that she should nonetheless be held in contempt for failing to cooperate and for excessively delaying the passport process. The district court found that Diette hadn't delayed getting a passport because even though the parenting-plan hearing

6

was on October 14, 2015, the journal entry of that hearing (ordering her to get the passport) wasn't actually filed until December 31, 2015, and she had the passport by February 3, 2016. (Rana filed his contempt motion 20 days after the journal entry was filed.) Rana makes much of the district court's conclusion that a party needn't comply with a journal entry until it's filed; he argues that Diette's passport obligation began in mid-October when the details of the parenting plan were announced from the bench. (The journal entry wasn't filed until later because the parties couldn't agree on the actual terms for the journal entry.) But we needn't decide whether the court's order was effective in October (when made from the bench) or December (when filed), because in either case, the district court reached the correct result by finding no contempt based on any delay on Diette's part. The goal of civil contempt is to force the other party to comply with a court's order. *J.T.R.*, 47 Kan. App. 2d at 95. The district court correctly found that no purpose would have been served by finding Diette in contempt—and then imposing a sanction intended to coerce compliance—when Diette had already complied with the court-ordered parenting plan by getting Ayanna a passport.

Rana advances one other argument related to the passport issue: He claims that the district court erred by finding that the 90-day-notice provision was a condition precedent to the requirement that Diette obtain a travel visa for Ayanna. The parenting plan requires Diette to get Ayanna a visa to facilitate international travel, and it also requires Rana to provide 90 days' notice of a detailed travel itinerary. As a matter of logic, the district court's conclusion—that Diette wouldn't be able to get a visa until Rana made travel plans and told her about them—may be reasonable. But we decline to review this finding because it was not part of Rana's contempt motion; Rana made no allegation that Diette had failed to comply with the *visa* provision of the parenting plan. Rana alleged only that Diette had failed to get a *passport*.

Next, we must review whether Diette's conduct related to phone calls was contemptuous. The parenting plan said that when Ayanna is with one parent, the other

7

parent could call Ayanna "by phone with reasonable frequency and at reasonable times of the day." The plan also instructed that missed phone calls be "returned promptly, preferably the same day," and at least within 24 hours. Rana narrowly focused on the phrase "promptly, preferably the same day," and on the factual finding in the parenting plan that "calls are not always returned in a prompt manner, and you need to put yourself in that other party's position, that if you call to speak to the child, you want your call returned; you need to do the same." He argued that Diette wasn't complying with the parenting plan and should be held in contempt because he said she was regularly returning calls the next day.

But Rana ignores that while the parenting plan expressed a preference for return calls on the same day, it actually allowed a full 24 hours for calls to be returned. So when Diette didn't have Ayanna return calls until the next day, she wasn't violating the court-ordered parenting plan as long as the return calls were within the 24-hour window—that's not contemptuous conduct, at least when the district court made no finding that Diette was regularly and purposely delaying return of the calls.

Rana did allege one instance (which Diette disputed) in which a call was returned outside the 24-hour limit. But even if we accept Rana's allegation as true, we don't find that returning one phone call outside the 24-hour window is a contemptuous failure to comply with a court order. Finally, we note that Rana's contempt motion actually asked the district court to impose a new rule requiring Diette to return calls within 1 hour except in cases of emergency—such a ruling would effectively modify the terms of the parenting plan, not simply require Diette to comply with the parenting plan. See *Faubion v. Phillips*, No. 113,709, 2016 WL 3856668, at *6 (Kan. App. 2016) (unpublished opinion) ("The intent of the penalty for civil contempt is to enforce the court's order."). The district court correctly denied Rana's contempt motion with regards to the phone calls because Diette's conduct wasn't contemptuous.

Rana's brief on appeal also claims that the district court wrongly dismissed his motion to enforce the parenting plan and argues that the district court didn't make sufficient findings of fact and conclusions of law. It's difficult to discern Rana's argument on this point, in part because he doesn't challenge the district court's simultaneous ruling that ordered the parties into case management.

The motion to enforce alleged that Diette once failed to have Ayanna return a phone call within 24 hours, that she failed to tell Rana about Ayanna's first Holy Communion, and that she monitored Rana's calls with Ayanna by using a speakerphone. At the hearing on this motion, Diette's lawyer admitted to returning one call late but alleged that while Ayanna was visiting Rana, Rana had also failed to have Ayanna return a call within 24 hours. Diette admitted that she hadn't told him about Ayanna's first Holy Communion but disputed whether she was required to, and she denied monitoring his calls with Ayanna. So while it's possible that Diette isn't complying with the spirit of cooperation encouraged by the parenting plan, Rana hasn't clearly pointed to any specific provisions (except for one call returned late) that Diette has violated.

The district court denied the motion to enforce and ordered the parties into case management, noting that while it expected the parties to comply fully with the details of the parenting plan, the complaints in this motion weren't the kind that could be easily managed by a court: "I do intend those orders to be followed in the detail they are, but this isn't a thing that this Court is going to be in a position to manage very well." The district court's conclusion seems well taken. From the record on appeal and the number of motions and hearings in this case (698 filings or other actions listed on the court docket and 192 court settings from August 2010 to June 2016), it's clear that these parties don't communicate well. While we respect that Rana wishes to protect his parenting time with his child, the district court would have great difficulty, in contested court hearings, to manage questions about whether one party has made "best efforts" to comply with each element of a parenting plan or has made only "minimal efforts." At the hearing, Rana's

attorney stated that he wanted "to figure out how we're to enforce these co-parenting orders" but admitted that "we're going to end up in case management, because attorneys—we can't handle these things—day-to-day things that are occurring." Essentially, the district court decided that case management was the best way to enforce the parenting orders, and Rana doesn't challenge that order in this appeal.

II. *Rana's Due-Process Rights Weren't Violated.*

Rana next argues that the district court violated his due-process rights by not holding an evidentiary hearing on either of his motions.

The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *In re J.D.C.*, 284 Kan. 155, 166, 159 P.3d 974 (2007). When reviewing a procedural-due-process claim, we first ask whether a protected liberty or property interest is involved. If it is, we then determine the nature and extent of the process due. 284 Kan. at 166.

To be sure, there are constitutionally protected interests at stake here: A parent has a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution to make decisions regarding the care, custody, and control of the parent's child. Before a parent can be deprived of the right to the custody, care, and control of the child, the parent is entitled to due process of law. *In re Adoption of A.A.T.*, 287 Kan. 590, 600-01, 196 P.3d 1180 (2008); see *In re X.D.*, 51 Kan. App. 2d 71, 74, 340 P.3d 1230 (2014).

But even if a protected liberty interest is at stake, "[a] due process violation exists only when a claimant is able to establish that he or she was denied a specific procedural protection to which he or she was entitled." *J.D.C.*, 284 Kan. at 166. In this case, Rana claims he was entitled to evidentiary hearings to prove the ways that Diette had violated

10

the parenting plan. In addressing this argument, we assume without deciding that the denial of an evidentiary hearing about whether Diette violated the parenting plan does implicate Rana's fundamental right to parent his child.

Again, the heart of due process is a meaningful opportunity to be heard. *J.D.C.*, 284 Kan. at 166. Evidentiary hearings aren't always required: "The type of due process required in any given case varies depending on the interests involved. In some cases, due process will require a full evidentiary hearing and in other cases far less is necessary." *Eck v. Eck*, No. 112,902, 2016 WL 368071, at *2 (Kan. App.) (unpublished opinion) (citing *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 898, 47 L. Ed. 2d 18 ([1976]), *rev. denied* 305 Kan. 1251 (2016).

Consistent with these principles, the local rules in family court in Sedgwick County provide the district court discretion to decide whether an evidentiary hearing is necessary: "Unless otherwise ordered, an evidentiary hearing can occur *only if granted by the Court* following a motion heard on the regular motion docket." (Emphasis added.) Sedgwick County Local Court Rule 414. According to the United States Supreme Court in *Mathews*, we should weigh several factors when deciding what kind of process is needed:

> "'(1) the individual interest at stake; (2) the risk of erroneous deprivation of the interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (3) the State's interest in the procedures used, including the fiscal and administrative burdens that the additional or substitute procedures would entail. [Citations omitted.]'" *Winston v. Kansas Dept. of SRS*, 274 Kan. 396, 409-10, 49 P.3d 1274, *cert. denied* 537 U.S. 1088 (2002) (quoting *State v. Wilkinson*, 269 Kan. 603, 608-09, 9 P.3d 1 [2000]).

Considering these factors, was an evidentiary hearing required in this case to protect Rana's parental rights? In a word, no.

11

We recognize that parents have a fundamental right to make decisions regarding the care, custody, and control of the parent's child and that Rana's parenting time is at least connected to that right. But at the same time, Rana's allegations, even if true, represent relatively minor problems that are more about the spirit of the parenting plan than its actual terms (returning calls the next day, one or two calls returned outside the 24-hour window, not informing him of first Holy Communion). And the district court spent a substantial amount of time handling Rana's motions; it held a hearing each time (for contempt, to alter or amend the contempt ruling, and to enforce the parenting plan). None of these were evidentiary hearings, but they included oral argument from each side and at least two of them were more than an hour long. Rana didn't personally attend these hearings, but his attorney did, and Rana was available by phone if needed. In these circumstances, Rana's due-process rights weren't violated.

III. *The District Court Had Authority to Order Rana to Pay Attorney Fees.*

Rana next claims that the district court didn't have the authority to impose attorney fees in this case. (He doesn't challenge the amount of the attorney fees he has been ordered to pay—just the district court's authority to award them.)

As a general rule, Kansas courts cannot award attorney fees unless a statute authorizes the award (or there is an agreement between the parties allowing attorney fees). *Snider v. American Family Mut. Ins. Co.*, 297 Kan. 157, 162, 298 P.3d 1120 (2013). Whether a court has the authority to award attorney fees is a question of law subject to our unlimited review. 297 Kan. at 162.

In this case, the district court awarded attorney fees under K.S.A. 2016 Supp. 23-2216(a), which provides that in a paternity action, a court may award costs and attorney fees to either party "as justice and equity may require." Determining whether this statute applies is a question of statutory interpretation that we review independently, without any

12

required deference to the district court's interpretation. *Cady v. Schroll*, 298 Kan. 731, 734, 317 P.3d 90 (2014).

K.S.A. 2016 Supp. 23-2216 is part of the Kansas Parentage Act. The parties agree that this case originated in 2010 as a paternity action. And back in January 2011, the district court filed a journal entry establishing Rana's paternity. Rana argues that because the paternity issue was settled long ago, the attorney-fee statute of the Kansas Parentage Act no longer applies to this case. In support, Rana cites one unpublished case from this court: *Ostrom v. Mergen*, No. 93,359, 2006 WL 903146, at *2 (Kan. App. 2006) (unpublished opinion). While our unpublished cases are not considered to be binding as precedents, they still may be considered for their persuasive value. See Supreme Court Rule 7.04(g) (2017 Kan. S. Ct. R. 45).

In *Ostrom*, after the father acknowledged paternity, the district court ordered him to pay child support and issued an income-withholding order to the father's employer (to deduct the child support from the father's paychecks). The income-withholding order was also sent later to the father's second employer, and this caused him to overpay his child support through these automatic paycheck deductions. The father hired a lawyer to correct the situation, and he eventually was refunded the amounts he had overpaid—but the court also awarded him attorney fees.

On appeal, our court found that the attorney-fee statute in the Kansas Parentage Act didn't apply because even though the case had started as a paternity action, the father's "request for attorney fees had nothing to do with the paternity action, and everything to do with the issuance of several [Income Withholding Act] orders." 2006 WL 903146, at *2. In other words, the dispute that caused the father to accrue attorney fees didn't come from problems with the paternity order or the child-support order—it came from problems with the income-withholding order, which was authorized by the Income Withholding Act. 2006 WL 903146, at *2. The Income Withholding Act is a

13

statutory scheme distinct from the Parentage Act. Significantly, the Income Withholding Act has its own specific remedy for wrongfully withheld income (a refund of the overpayment); it doesn't authorize attorney-fee awards. 2006 WL 903146, at *2. So the *Ostrom* court held that the district court lacked authority to award attorney fees in a challenge to an income-withholding order, even though the income-withholding order enforced support rights established in the underlying paternity case. 2006 WL 903146, at *2.

Rana argues that this case is like *Ostrom*: "There are currently no proceedings before the [district court] concerning parentage; therefore the statutory authority under that section is no longer available." But *Ostrom* is different because there, the attorney fees were accrued in a separate action about withheld income, not in a post-judgment motion in the paternity case. Here, even though paternity is settled, the case has continued as the parents return to court again and again with disagreements about the parenting plan. And the Parentage Act expressly contemplates that paternity actions will include court orders about parenting time. See K.S.A. 2016 Supp. 23-2215(d) ("If both parents are parties to the action, the court shall enter such orders regarding custody, residency and parenting time as the court considers to be in the best interest of the child."). For so long as a child subject to that order remains a minor, the court has authority to consider motions to modify the parenting plan. See K.S.A. 2016 Supp. 23-3219(a) (providing requirements for factual specificity in motions to modify final orders concerning custody or residential placement in paternity and divorce actions).

It's true that no specific case or statute has expressly extended the authority in K.S.A. 2016 Supp. 23-2216 to award attorney fees in later proceedings to modify custody or parenting plans in paternity cases. *Wells v. Ashbaugh*, No. 112,050, 2015 WL 1882192, at *10 (Kan. App. 2015) (unpublished opinion). But nothing in K.S.A. 2016 Supp. 23-2216 suggests that this provision applies only to the initial determination of custodial matters and not to later modifications considered in the same proceeding.

14

Kansas courts have considered this question in the context of a divorce case. K.S.A. 2016 Supp. 23-2715, which gives a district court the authority to award attorney fees in divorce cases, contains identical language to that in K.S.A. 2016 Supp. 23-2216(a): Both state that "attorney fees may be awarded to either party as justice and equity [may] require." And the authority to award attorney fees in divorce situations has been specifically applied to later proceedings for the modification of child-custody orders after the divorce was granted. See *Tyler v. Tyler*, 203 Kan. 565, Syl. ¶ 5, 455 P.2d 538 (1969). Since the *Tyler* court was construing virtually the same language that is included in both the current Parentage Act and the current divorce statute, we see no reason why its holding should not apply to cases like this one, where one parent seeks to modify a court-ordered parenting plan well after paternity has been established. See *Wells*, 2015 WL 1882192, at *10. Indeed, our court has affirmed such awards in several cases, albeit without specific discussion of the district court's authority. See, *e.g.*, *In re Paternity of A.L.*, No. 113,355, 2016 WL 758332, at *6 (Kan. App. 2016) (unpublished opinion) (affirming attorney-fee award in dispute about allocation of travel expenses related to parenting time); *In re Paternity of A.L.*, No. 109,289, 2014 WL 113460, at *4-6 (Kan. App. 2014) (unpublished opinion) (same); *In re Paternity of A.L. v. Florez*, No. 104,684, 2011 WL 2801080, at *4-5 (Kan. App. 2011) (unpublished opinion) (affirming attorney-fee award where father had challenged terms of the parenting plan and lost in the district court). We agree with the district court that it had the authority to assess attorney fees in this case.

IV. *The District Court Similarly Had Authority to Split the Cost of Case Management 80% to Rana and 20% to Diette.*

Last, Rana argues that the district court didn't have authority to split the cost of case management 80% to him and 20% to Rana. Once again, we review both the interpretation of statutes and the district court's authority to award attorney fees anew, without any required deference to the district court's conclusions. *Snider*, 297 Kan. at 162.

15

Case management is a process in which the court appoints a neutral case manager to assist "the parties by providing a procedure, other than mediation, which facilitates negotiation of a plan for child custody, residency or visitation or parenting time." K.S.A. 2016 Supp. 23-3507. When appointing a case manager, the district court is required by statute to consider "the financial circumstances of the parties and the costs assessed by the case manager." K.S.A. 2016 Supp. 23-3508(c)(2). The statute also notes that the case manager may "file for collection of costs as necessary." K.S.A. 2016 Supp. 23-3509(a)(6). And the word "costs," as used in these statutes, has a specific meaning.

At the end of civil cases generally, "costs" are "taxed" by the clerk of the court—in traditional civil actions, against the losing party. See K.S.A. 2016 Supp. 60-2001. In paternity cases, as we've already noted, "[c]osts and attorney fees may be awarded to either party as justice and equity may require." K.S.A. 2016 Supp. 23-2216(a); see K.S.A. 2016 Supp. 23-2715 (authorizing assessment of costs and attorney fees in divorce actions as justice and equity may require). So case-management fees, which are "costs," may be assessed by the court in any way that's reasonable.

We recognize that there are some other provisions in the Kansas Family Law Code that, in addition to referencing "costs" generally, have specific provisions that the cost of those proceedings can be assigned to either or both parties "as justice and equity require." K.S.A. 2016 Supp. 23-3506 (mediation); K.S.A. 2016 Supp. 23-3510(b) (counseling). But the lack of such a provision in the case-management statutes does not indicate a contrary intention. The Kansas Family Law Code, enacted in 2012, brought together various statutory provisions that had been adopted at different times, so it's not surprising that there would be some differences in drafting between them. Even so, case-management orders entered in paternity cases cause "costs" to be incurred—the case manager's fee—and K.S.A. 2016 Supp. 23-2216(a) allows costs to be allocated in a reasonable way by the court.

16

There is one other statutory provision regarding the costs of case management, K.S.A. 2016 Supp. 23-3509(d)(7), which provides for an allocation of costs incurred when one party objects to the case manager's recommendations: "Costs of the procedure and professional time may be assessed to the party who objected to the recommendations in the journal entry or may be otherwise assessed by the court." That provision confirms once again that the fees of the case manager are "costs," but it has no application to the question now before us—it applies only when a party has objected to a case manager's recommendation and the court has held a hearing on that objection. In such cases, the costs may be assessed against the objecting party or assessed in some other manner, as determined by the court.

So the district court had authority to assess the costs of case management. Rana also argues, briefly, that the division of the costs—80% to him and 20% to Diette— wasn't reasonable based on the evidence. We review a district court's division of costs for an abuse of discretion, meaning we will only reverse if the division is arbitrary or is based on an error of law or fact. See *Snider*, 297 Kan. at 169. The district court relied on Rana's and Diette's earning histories and incomes as reflected in the domestic relations affidavits that they had filed with the court over the years. Those affidavits showed that Rana made more money than Diette. Thus, we cannot say that the district court abused its discretion by ordering Rana to pay more of the case-management costs.

V. *We Award Diette Attorney Fees Incurred in This Appeal.*

After oral argument, Diette filed a timely motion with our court asking us to order Rana to pay the attorney fees she incurred in this appeal. Supreme Court Rule 7.07(b)(2) (2017 Kan. S. Ct. R. 50) (motion for attorney fees must be filed within 14 days of oral argument). We have the authority to award attorney fees if the district court had that authority. Supreme Court Rule 7.07(b)(1) (2017 Kan. S. Ct. R. 50); see *In re J.M.D.*, 293 Kan. 153, 174, 260 P.3d 1196 (2011). And as we've explained, the district court had

authority under K.S.A. 2016 Supp. 23-2216(a) to award attorney fees to either party "as justice and equity may require."

According to the affidavit and billing statement that Diette submitted with her motion, her lawyer spent $9,297.50 working on this appeal, at a rate of $275 per hour. We find the district court's division of the case-management costs reasonable. On that basis, we determine that Rana should pay 80% of Diette's attorney fees on appeal; we therefore grant Diette's motion and award her $7,438 for partial reimbursement of her attorney fees.

We affirm the district court's judgment.